## STYKA v. STYKA

[No. 316, September Term, 1969.]

*Decided April 2, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Richard C. Whiteford,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*Irving Bowers,* with whom was *Sidney Kaplan* on the brief, for appellee.

McWilliams, J., delivered the opinion of the Court.

Andrew Styka and Ligia Ramirez were married in New York City in June 1959. He is a Pole; she was born in Colombia. He is fluent in Spanish and English; she speaks no Polish and only kitchen English. From the beginning, according to him, their marriage was plagued by her "terrible and uncontrollable moods." There were times, he said, when coming home was "just like walking into a hell." She, on the other hand, said they were "very happy together." There are no children.

In April 1968 they left New York and came to Baltimore County so that Andrew could be near his work. He had been hired as an engineer by the Head Ski Company. With them came Norita Cortez, a maid sent from Colombia by Ligia's family and Maria Gornyzka, a visitor from Poland, related distantly to Andrew. Ligia got the notion that Maria was not only carrying on with a number of men, including Andrew, but that she also had Lesbian designs on Norita. Andrew testified that she chased him around the house with "knives and crystal vases" and threw at him whatever was at hand. On two occasions he was obliged to call the police. Maria witnessed Ligia's armed pursuit of Andrew one night in August. She said she had "never in * * * [her] life seen a wife have knives toward her husband." She left the next morning.

On the night of 10 October, according to Andrew, Ligia slipped a note under his bedroom door. The note, in Spanish,[1] is dated "9-7/68." She calls it her last note (*carta*) to him and she went on to say that on the day following she (and Norita) would leave the house for-

---

1. As translated by Andrew (Ligia does not agree), it states: "Andrew, this is the last letter I am writing, about leaving tomorrow, while going forever, from this house. This is sad after ten years of living together. I am on the street without money, without work and leaving the little that I have, without knowing where I am going. I am very sick. Please take care of my things until the time when the lawyers are going to get in touch with you. Thank you for the food and facilities to live for these ten years, Ligia"

ever (*"mañana nos vamos para siempre de esta casa"*). She had gone when Andrew returned home from work the next day. He assumed, correctly it seems, that she "went to the house of one of her Colombian friends" in New York. He moved to a nearby small hotel a day or so later. On 15 October he filed a bill for a divorce a mensa et thoro. She testified she returned home on 16 October but the sheriff's return shows that service of process was made upon her, on 17 October, at the New York address. At about this time she wrote to Andrew's mother saying she didn't want him any more. Counsel for the parties seem to have tried, without success, to resolve their differences.

On 6 January 1969, Ligia answered the bill of complaint and filed a "Counter Complaint" alleging desertion by Andrew but asking only for alimony, counsel fees and general relief. The case came on for trial before Maguire, J., on 31 January 1969. After two days of testimony Judge Maguire said, from the bench:

"(The Court) Gentlemen, in this case we have two apparently essentially different stories. It is obvious to the Court that the relationship between Mr. and Mrs. Styka was a very unpleasant one for some period of time. These matters are normally not very difficult, particularly when there are no children involved, and there are none in this case, so it becomes a matter for the Court to determine whom does it believe. If I believe Mr. Styka, then whatever Mrs. Styka has had to say to me, has testified to, and her maid, are complete perjury. If I choose to believe her as to what her testimony and her witnesses, and not Mr. Styka, then his testimony is completely of a perjured nature. That is exactly where we stand, whom the Court may or may not believe."

\* \* \*

"This letter [9-7/68] has to be given a great

deal of weight because of the contents of the letter and there is no question about what it says. Properly interpreted, it says we are not getting along and I am going to leave."

* * *

"It is most unfortunate to get into these situations where in a court of law, where two adult people are testifying, and somebody lies from the very beginning. It shocks the conscience of the Court to do a thing like that because it is obvious to me one or the other has no respect for the truth.

"There are no children involved, so if the Court sees fit not to grant the a mensa divorce, the status of the husband and wife doesn't change any. If the Court sees fit to grant, of course, it changes. It seems to me under the circumstances that exist, the husband said he could never live with her and the wife says well, he can come back—but it is hard to believe that she is sincere about that. * * *."

* * *

"There is no problem with respect to the Court because there are no children involved. I think that that, and the letter written by the wife, she fully intended to separate, no longer live with Mr. Styka. And I think that she left for New York with the intention to go to New York and to come back when she was good and ready. I think she deserted the husband at that time.

"If you will prepare a decree for a divorce a mensa et thoro * * *, I will sign it."

Placing great reliance on *Boyd v. Boyd,* 177 Md. 687 (unreported), 11 A. 2d 461 (1940), Ligia insists that "a five day absence is not desertion." The record suggests her stay may have been a little longer. We did say in *Boyd,* where the wife filed her bill for a divorce a mensa

within 48 hours after her husband's departure, that the length of time during which the separation has existed ought to be considered in determining whether an alleged abandonment is real, or exists merely in the imagination or desire of the complaining party. But we also said that "a divorce for abandonment and desertion under the provisions of * * * [Code, Art. 16, § 25 (1966 Repl. Vol.)] may be granted without regard to the duration of the abandonment." 11 A. 2d at 464. The chancellor was reversed, not because of the hasty filing of Mrs. Boyd's bill of complaint but because there was a complete lack of corroboration of her testimony. In different circumstances it very well might be that a "five day absence" would not amount to desertion but, even if we assume it has the significance Ligia assigns to it, there is attenuating evidence here which cannot be overlooked.

To support her argument that Andrew consented to her leaving, Ligia refers us to her testimony that he asked her for a divorce early in the morning of the day she left the house. But she also testified that earlier that same morning he came to her bedroom, admitted Maria was not "his cousin," that "he wanted her here * * * and [he] apologized." Then, she went on, Andrew said, "Oh Ligia, you love me and I love you." She made no reply; as she put it, "I do not say nothing, I show her." That Judge Maguire chose not to believe her is understandable. She argues further that Andrew's refusal of her several offers of reconciliation amounts to a consent to her desertion. Judge Maguire found it "hard to believe that she * * * [was] sincere about that." See Code, Art. 16, § 26A (1969 Cum. Supp.), and Jester v. Jester, 246 Md. 162, 169-70 (1967). In this regard there comes to mind the letter, dated 17 October 1968, to her mother-in-law in which she said she didn't "want him any more because he is very disonest person." In the same letter, after noting that Andrew was "almost 47," she said, "I don't loos to much because I am a young woman." In conclusion she informed her mother-in-law that she was "feeling very well," that she had lost 14 pounds (she testi-

fied she had been "very heavy") ; that her clothes were a better fit and that "on Saturday * * * [she expected to] go for a party with orquesta, etc."

There remain only the proforma contentions that the letter of 7 September 1968 (in Spanish) is not sufficient evidence of an intention to desert and that there is no corroboration. Judge Maguire thought her "intention was obvious" and that the letter " * * * basically, said 'I am going to leave'." We are unwilling to say that he is clearly in error in this regard. Familiar to all lawyers is the rule "[t]hat *every* element *must* be corroborated" but that "in a contested divorce case where there is no basis for inferring collusion the corroboration need only be slight." *Smith v. Smith,* 257 Md. 263 (1970). We said recently, in *Ballan v. Ballan,* 251 Md. 737, 740 (1969), what has been said so often, i.e., that "[d]esertion has two elements, the ending of cohabitation and the intention to desert." That the ending of cohabitation has been corroborated is too obvious for further discussion. While the letter of "9-7/68" to Andrew and the letter of 17 October 1968 to Andrew's mother might have failed to provide the corroboration (of Ligia's intention to desert) required by former Maryland Rule S75 (deleted as of 1 October 1968) we think they amount to sufficient corroboration in the case at bar since the deletion of Rule S75 restored Code, Art. 35, § 4 (1969 Cum. Supp.) to its former effectiveness. The 1968 amendment to § 4 left undisturbed the clause construed in *Maranto v. Maranto,* 192 Md. 214, 217 (1949), which is applicable here.

Judge Maguire was presented with "two apparently essentially different stories." He was there; he saw the witnesses; he heard them testify. He must have learned about them much more than the cold record reveals to us. Rule 886 a requires us to give "due regard" to his "opportunity * * * to judge * * * [their] credibility." He elected to believe Andrew. We cannot say his judgment was clearly erroneous.

> *Decree affirmed.*
> *Costs to be paid by the appellee.*