# JESSIE C. FLOOD *v.* IDA MAE FLOOD

[No. 465, September Term, 1974.]

*Decided January 23, 1975.*

396

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

*Jeffrey I. Goldman,* with whom were *Bruce Spizler* and *Walker & McCadden* on the brief, for appellant.

*Joseph J. Askin* for appellee.

ORTH, C. J., delivered the opinion of the Court.

I

This appeal first calls upon us to decide whether an adulterous [1] wife may be awarded alimony [2] upon the grant

---

1. Adultery is a crime in Maryland with a fine of $10 as the authorized punishment. Code, Art. 27, § 4. It has been held that the legislature intended "adultery" as a crime to carry its common law meaning, that is, criminal conversation with a man's wife, the test being whether the woman was married. *Evans v. Murff,* 135 F. Supp. 907 (D. Md. 1955); *Hughes v. State,* 14 Md. App. 497, 505, n. 7. *Cf. Cole v. State,* 126 Md. 239. Code, Art. 16, § 24, however, establishing causes, of which adultery is one, for an *a vinculo* divorce is not penal in nature, but prescribes a remedy by civil suit for the violation of marital obligations. *Dimpfel v. Wilson,* 107 Md. 329; *Elliott v. Elliott,* 38 Md. 357; *Herbert v. Gray,* 38 Md. 529. We believe that "adultery" as used in the divorce statute is not restricted to its common law meaning but has the more general meaning of voluntary sexual intercourse between a married person and a partner other than the lawful husband or wife. *See The American Heritage Dictionary of the English Language.* We find this to be self evident in the opinions of the Court of Appeals dealing with adultery as a cause for divorce. And *see Shanbarker v. Dalton,* 251 Md. 252, 257.

2. Technically, "Alimony is a money allowance payable under a judicial decree by a husband at stated intervals to his wife, or former wife, during their joint lives or until the remarriage of the wife, so long as they live

to an adulterous husband of a divorce *a vinculo matrimonii* on a nonculpable ground.

*The Law*

*Courson v. Courson,* 213 Md. 183, concerned an act of adultery by a wife who was living separate and apart from her husband by virtue of a divorce *a mensa et thoro.* A majority of the Court, over the vigorous dissent of two of its members, said flatly, at 188: "We hold the proper rule, supported by reason and authority, is that when a wife, who is living separate and apart from her husband due to his fault and who has obtained no more than a limited divorce from him, commits adultery, she forfeits her right to her husband's support and the future payments of alimony." The rationale of the holding was found in the language of the New Jersey Court of Chancery in the case of *G_____ v. G_____,* 56 A. 736, 740, with which the majority of the Court of Appeals voiced complete agreement: "Under a divorce *a mensa et thoro* the marriage relation still exists, and with it the duty of chastity. Such a divorce is not license to the wife to indulge in sexual connection with another man . . . ." [3] 213 Md. at 188.

The Court of Appeals does not appear to have expressly departed from its holding in *Courson.* In *Flanagan v. Flanagan,* 270 Md. 335, however, although referring to *Courson* only with respect to the history of alimony in

---

separately, for her support and maintenance." *Knabe v. Knabe,* 176 Md. 606, 612. *See Foote v. Foote,* 190 Md. 171; *Bart v. Bart,* 182 Md. 477. Code, Art. 16, § 3, declares: "In cases where a divorce is decreed, alimony may be awarded." The Court of Appeals reads "alimony" in this legislative declaration "not in the technical sense of the word, but as commensurate with 'support'." *Clayton v. Clayton,* 231 Md. 74, 77. *See Dackman v. Dackman,* 252 Md. 331. Although we need not go beyond the technical meaning of alimony in determining the case before us, nothing we say in this opinion is to be construed as implying that an equity court either may or that it may not make a pecuniary award in the nature of "alimony" payable by a wife to her husband. We shall decide that question when it is before us. *See Colburn v. Colburn,* 20 Md. App. 346.

**3.** The Court noted that it had not been required in the suit to pass upon the right of a wife, who has been granted an absolute divorce and alimony and who thereafter commits "adultery", to continue to receive support from the former husband. It specifically refused to express an opinion thereon at the time. 213 Md. at 188-189. *See Atkinson v. Atkinson,* 13 Md. App. 65.

Maryland, and not discussing the *Courson* holding, it dealt with wrongdoing as affecting alimony. Pointing out that in determining an award of alimony, a court should consider, among other factors, *"the circumstances leading up to the separation, the fault which destroyed the home"*,[4] it observed that it was firmly established that when a wife's fault precludes her from procuring a divorce she is prevented from obtaining alimony. At 339. It followed that in a divorce action on culpable grounds where there was no right to a divorce, there was no right to alimony. And, the Court determined, its previous opinions which established the standards for fixing alimony [5] were equally applicable in a nonculpatory divorce action.[6] Thus, concluded the Court, although the parties' economic circumstances are certainly of great importance,[7] "any of their conduct which contributed to the destruction of the marriage is also relevant to a determination of what is just." At 341. It spoke of the discretion of the chancellor in such matters:

> "As each factual situation is unique, it is obvious that the chancellor must be entrusted with wide discretion in awarding alimony. This would include those cases in which he is required to consider the culpability of the parties by taking into account the circumstances leading up to that point in time when the couple, who have been joined in marriage to become one, separate and become two once more, as well as the fault which destroyed the home." 270 Md. at 341.

The Court then distinguished acts of wrong doing. It held that ". . . in those suits in which the actions of the party seeking such a pecuniary award constitute the sole cause for

---

4. From *Timanus v. Timanus,* 178 Md. 640, 642.

5. The authority for allowing alimony is statutory, but the standards governing its award are judicial. *Willoughby v. Willoughby,* 256 Md. 590.

6. The Court said, 270 Md. at 340: "This is logically so and there is nothing in the public policy of Maryland as expressed in the statute to the contrary."

7. Code, Art. 16, § 5 (a) prescribes that alimony or counsel fees may not be awarded ". . . unless it shall appear from the evidence that the wife's income is insufficient to care for her needs."

the demise of the marriage, and their wrongdoing consists of acts which are either adultery or abandonment, then, except in rare instances where there exist extremely extenuating circumstances, the award of any alimony would be an abuse of discretion." At 341. As to acts causing the separation, other than adultery or abandonment on the part of one party, or fault on both sides which caused the separation, ". . . the chancellor should consider the parties' degree of blame as well as their relative guilt in those cases when applicable and, in conjunction with [other factors to be considered],[8] decide upon the proper award. In this thought process, the greater degree of fault on the part of the wife demonstrated, the greater the need which she must show to entitle her to an award of alimony appropriate to the circumstances otherwise existing." At 341-342.

Thus, *Flanagan* clearly concerned acts which caused or contributed to the separation of the parties, and which, therefore, were necessarily committed before the marriage's demise. *Courson* concerned acts committed after the separation of the parties was a *fait accompli*. Under *Flanagan*, if it is the wife's act which is the *sole cause* for the demise of the marriage, and that act is adultery, she is precluded from obtaining alimony "except in rare instances where there exist extremely extenuating circumstances." Under *Courson*, if the wife commits adultery after the separation, she *ipso facto* loses all right to alimony; not even the mercy of "extremely extenuating circumstances" is indicated in *Courson.* So, to this point of comparison, it seems that an adulterous act causing the demise of a marriage is to be treated with somewhat more leniency than

---

8. Some of the factors to be considered were enunciated in *Timanus v. Timanus, supra,* at 642 and quoted in *Flanagan* at 339:

" 'It is a general rule that a court, before determining the award of alimony, should consider the maintenance of the wife in accordance with the husband's duty to support her suitably, together with the husband's wealth and earning capacity. In addition to the financial circumstances of the parties, the court should also usually consider their station in life, their age and physical condition, ability to work, the length of time they lived together, the *circumstances leading up to the separation, the fault which destroyed the home,* and their respective responsibilities for the care and support of the children.' (Emphasis added.)"

an adulterous act committed after the separation and not contributing to it. But in either event, the general rule is that the wife is not entitled to alimony.

*Flanagan* leaves unanswered what happens in a nonculpable divorce suit when the actions of the wife seeking alimony do not constitute the sole cause for the demise of the marriage, but there is fault on both sides which caused the separation of the parties, and the fault of the wife is an act of adultery. We can only read *Flanagan* as holding that in such circumstances the chancellor should consider the degree of blame as well as the relative guilt of the parties, and, in conjunction with other factors to be considered, decide upon a proper award. As quoted *supra*, *Flanagan* declares: "The greater degree of fault on the part of the wife demonstrated, the greater the need which she must show to entitle her to an award of alimony appropriate to the circumstances otherwise existing." We note that the degree of fault on the part of the adulterous wife may be mitigated if the contributory fault of the husband is also an act of adultery.

The holdings of *Courson* and *Flanagan*, read together, may not be disparate, but they are anomalous. Under *Flanagan*, a wife whose act of adultery, committed before the fact of separation, contributed to it, may be awarded alimony if the husband is also guilty of wrongdoing contributing to the separation. But if she commits adultery after the fact of separation, she may not, under *Courson*, receive alimony in any event.[9]

## The Facts

We turn to the facts of the case before us. On 19 November 1969 JESSIE C. FLOOD (Husband) filed an amended Bill of Complaint[10] against IDA MAE FLOOD

---

**9.** We can see no practical distinction, under the *Courson* rationale alone, between a legal separation under an *a mensa* divorce and a separation in fact with the marriage relation in full force and effect.

**10.** The original Bill was filed 22 June 1964, alleging that Wife deserted Husband on or about 27 January 1957. An amended Bill was filed 9 August 1967, giving the cause for divorce that the parties had voluntarily lived separate and apart for more than 18 months.

(Wife) in the Circuit Court of Baltimore City for a divorce *a vinculo matrimonii* on the ground that the parties had been separated for more than five years. After a decree *pro confesso* and receipt of uncontested testimony of Husband, a decree was entered on 2 September 1971, granting the divorce, giving custody of minor children to Wife with support of them by Husband, and awarding permanent alimony to Wife. Husband's motion to review and correct the decree was denied and he appealed, attacking only that portion of the decree with respect to alimony. We held that a decree of divorce based on a nonculpatory ground did not exonerate Husband from the payment of alimony, but, we reversed that portion of the decree granting alimony. We thought that the chancellor did not have before him any evidence from which it appeared that Wife's income was insufficient to care for her needs. Code, Art. 16, § 5 (a). He could not, therefore, properly award a specific sum as alimony. We remanded for further proceedings. *Flood v. Flood,* 16 Md. App. 280.

Further proceedings below pursuant to our remand resulted in the entrance of a decretal order on 2 July 1974. Husband was to pay:

1) $15.45 per week through the Probation Department for support and maintenance of the minor child of the parties;

2) unto wife through the Probation Department $25.75 per week as permanent alimony accounting from 8 March 1974, subject to further order of the court;

3) $7.50 per week arrearages;

4) $300 as a contribution to the counsel fee of wife's attorney;

5) costs of the proceedings.

Husband appealed. He first asks: "Can the Court award alimony to a wife in a nonculpatory divorce action when it is shown that she committed adultery during the period of separation? "

*The Decision*

The chancellor found as a fact from the evidence adduced at the hearing that the fault which destroyed the home was Husband's conduct. He found that Husband had committed adultery. He elaborated on Husband's conduct — "... his continual going around with women, his admission which was not denied that he is the father of a child, the mother of which is not Mrs. Flood. The fact that the various women were in the home during the absence of Mrs. Flood on one occasion for six weeks, .... The argument that ensued as a result of the wife quite naturally confronting the husband with this behavior, I remember when I say this behavior, I mean staying away from home a great deal, staying out late at night, arguing with her, beating her. When she confronted him with that he not only admitted paternity, but he in effect told her to get out. So, looking at the totality of all those factors, I do find as a fact clearly that his conduct destroyed the marriage." There was evidence sufficient to support these findings. The chancellor also found that Wife had committed adultery in 1968, and there was evidence sufficient to support that finding. On cross-examination she was asked if she knew a James Jones. She admitted she did. She was extensively questioned on cross-examination, re-direct examination, re-cross-examination, and by the court at various times, with respect to whether she had sexual relations with Jones after she and Husband were separated in 1957. The net result of all the inquiries was that she did not remember whether she had sexual intercourse with Jones. But when she was asked if she "had intercourse with any other person other than your husband since you separated," she replied, "Sure, I have. I'm human, ain't I? " On the other hand, Jones was positive that she had intercourse with him. He testified that in July 1968 he was in Baltimore looking for a job and lived for a week in her home. During that time he had sexual intercourse with her "in her front bedroom where I was sleeping ... three times in that one night."

The chancellor found it significant that the adultery of the wife occurred well after the separation of the parties, and

did not contribute to the demise of the marriage. It troubled him, however, "in the sense that she is not blameless and she cannot get away from the adultery by saying I am only human, because that is persuasive to me, but the law is the law, and the law says you cannot commit adultery, but if you look at her adultery as compared to the other factors such as Mr. Flood's adultery, persistence of it, the fact that he had a child, the fact he was brutal and sent her to a hospital, also this is uncontradicted, particularly as corroborated by Mrs. Davis who said he didn't act as he should have, the fact that he stayed up all hours of the night, that he went with women. If you look at the test, it is ninety per cent his fault and ten per cent her fault." He concluded that she was entitled to alimony. In doing so he relied on *Flanagan.*

We would have no difficulty arriving at a resolution of the question along the path charted by *Courson.* Like *Courson,* here the fault of the husband caused the demise of the marriage. Like *Courson,* here the wife committed adultery after the fact of the separation of the parties. That in *Courson* the parties were legally separated by an *a mensa divorce* where here they were voluntarily separated, but not under legal aegis, is a distinction without a difference. If all we had to look to was *Courson,* we would be obliged to hold the Wife forfeited her right to Husband's support and the payment of alimony. But we have *Flanagan* also, and its light casts shadows on *Courson's* path. For reasons we have indicated, we are hard pressed to apply the strict rule of *Courson* in the light of *Flanagan.* We think that *Flanagan* tempers *Courson's* rule, *sub silentio,* or by implication, or by practical necessity in the interest of justice, at least, as it may have been applicable in the factual posture of the case here reviewed.

We hold that in the facts and circumstances of the case before us, Wife did not forfeit her right to payment of alimony by her adulterous act.

## II

Husband next asks on appeal:

> "In determining the amount of alimony to be awarded, does the party who asserts an inability to work, in order to sustain a greater award, carry the burden of proving the same? "

Ability to work is a factor to be considered by the chancellor in arriving at a proper award of alimony. *Timanus v. Timanus, supra.* The chancellor found as a fact that Wife was not able to work. He said:

> "I say that with a great deal of reluctance, because there is no medical testimony one way or the other. All I have is a report from the hospital which does show a rather serious operation in October of last year, but I don't know whether that would prevent her from working. It is significant after a month after that she did work for four days, but then she was not able to work she says beyond that period.
>
> "Neither side has presented medical evidence, so I am just left with her statement plus this discharge summary, and all I can say is as of this point I am not convinced she can work. I will go along with Mr. Smelkinson's [Husband's attorney] point that probably this lady — I say 'this' most kindly — probably if this lady were to lose some weight she might well not only be able to work, but be much healthier and in much less danger, but that is not my place to determine."

Wife testified that the last time she was employed was in October of 1973 when she worked for Life Like Products fixing lights and toys. She worked four days and had to go to the hospital. She asserted that she was not able to work. "It is my back and my side. I'm diabetic and I have high blood pressure." She said she went to the doctor every week, and sometimes twice a week. Other than the four days in 1973,

the last time she worked was in 1967 when she did cleaning work in an office building. A discharge summary of the Maryland General Hospital covering the period 25 October 1973 to 9 November 1973 when Wife was confined in the hospital, was received in evidence. It noted that physical examination " [o]n admission revealed an extremely obese black female in mild distress." She ". . . has been known to have diabetes mellitus, acute pyelonephritis, hypertension and possible acute papillary necrosis in the past. She was at Maryland General Hospital in April, 1973 with the above diagnosis." It was signed by James Kleeman, M.D. The court inquired if Dr. Kleeman had seen her recently. She said she had seen him "last Thursday — last Friday, and this last past Wednesday." He tested "my blood, you know, and my urine." He did not tell her anything and she was to go back to him next week. He gave her medication, "pressure pills. I have pills that I have to take for this operation that I had." It appeared that this operation was for the removal of a kidney stone. She takes them four times a day and has been taking them since 1964. She also took insulin for diabetes. The only income she had, "excusing my daughter give me twenty-five dollars", was $140 a month from "the Welfare." Assuming for the purpose of decision, that the party who asserts an inability to work must carry the burden of proof, Wife met this burden. The chancellor was satisfied, albeit, somewhat reluctantly, that she was unable to work, and as there was evidence to support this conclusion we cannot say he was clearly erroneous in his judgment thereon. Maryland Rule 1086. Husband complains about the absence of more probative medical evidence on the point. We observe that had he desired that she have further medical examination, he could have made proper request to that end.

### III

Husband lastly asks:

> "Can trial Court increase child support, sua sponte, where no request or petition has been filed for same? "

Wife does not meet the question. She argues only that the increase was warranted, but that is not the point Husband makes. She suggests that the power to compel the payment of support for minor children is "inherent in the Trial Judge in Equity Court." She does not, however, discuss this power in the light of *Woodham v. Woodham*, 235 Md. 356. The Court said in *Woodham*, at 361:

> "We think that the chancellor was in error, however, in increasing the support payments to the child from $20 to $50 sua sponte. Appellant, as custodian for the child, made no request for an increase. The court in its opinion simply stated as a conclusion that since the child was older her needs were greater, and that since the support payments to Mrs. Woodham had been terminated, the appellee would now have the primary responsibility for the child's support. No testimony was taken specifically directed to the child's needs, but it was brought out at the time of the hearing that she was earning $12 a week which she was allowed to retain. Of course, the support for the girl is subject to modification, but if it is to be increased there must be some formal request for it, supported by evidence of the necessity for modification of that part of the decree."

In *Beshore v. Beshore*, 19 Md. App. 474, 479, we quoted this language of *Woodham* with complete approval and applied its holding. *See Gatuso v. Gatuso*, 16 Md. App. 632.

Husband's attorney was right. We think that *Woodham* is dispositive of the question. Wife made no formal request to increase the amount to be paid as support for the child. Therefore, the action of the chancellor with respect thereto was improper. The decretal order of 2 July 1974 is modified to reduce the payments to Wife through the Probation Department of the Supreme Bench of Baltimore City for the support and maintenance of Michael Flood, the minor child of the parties, to the amount ordered in the decree of 2

September 1971, namely $10.30 per week, and, as so modified, is affirmed.

*Decree of 2 July 1974 modified as set out in this opinion, and as so modified, affirmed; costs to be paid by appellant.*