## THERESA Z. KRAMER *v.* HOWARD CALVIN KRAMER

[No. 927, September Term, 1974.]

*Decided June 4, 1975.*

The cause was argued before POWERS, GILBERT and DAVIDSON, JJ.

*John H. Price, Jr.,* and *I. Duke Avnet* for appellant.

*John J. Hirsch* for appellee.

DAVIDSON, J., delivered the opinion of the Court.

On 29 June 1973, in the Circuit Court for Baltimore County, Theresa Z. Kramer, the appellant (mother), filed a bill of complaint for an absolute divorce from Howard Calvin Kramer, the appellee (father), on the grounds of cruelty, constructive desertion and an uninterrupted separation of five years. Included among the prayers for relief were ones for alimony and for custody and support of the three minor children of the parties, Pamela, then age 17, Theresa, then age 14, and Priscilla, then age 12.

On 10 September 1974 Judge John N. Maguire filed a memorandum opinion and order in which he found that the father had not deserted the mother but that the parties had lived separate and apart for five years. His order, in pertinent part, awarded the mother an absolute divorce and denied her alimony, awarded the father custody of Theresa and Priscilla, and failed to provide child support payments for Pamela.[1] It is from the denial of alimony to the mother,

---

1. On 6 January 1974, a date after the filing of the bill of complaint and before the date of the hearing, Pamela, the eldest of the three children, had become 18 and, therefore, an adult. Code (1957, 1968 Repl. Vol., 1974 Cum. Supp.) Art. I, § 24 [hereinafter referred to as Art. I, § 24]. In a memorandum of law submitted to the chancellor, the mother contended that she was nonetheless entitled to support for Pamela since before the effective date of Art. I, § 24 the father had verbally agreed to support the children until they reached the age of 21.

the award of custody to the father and the refusal of support payments for Pamela that this appeal is taken.

I

On appeal the mother's primary contention is that the chancellor erred in awarding custody of the two minor children, Theresa and Priscilla, to the father. The governing principle with regard to an award of custody is that the best interest and welfare of the child are determinative. In undertaking appellate review of the chancellor's award of custody, this Court has limited the applicability of the "clearly erroneous" rule to the factual findings underlying the chancellor's conclusion as to what constitutes the best interest and welfare of the child, reserving the right to exercise our own best judgment as to the appropriateness of that conclusion. *Barsallo v. Barsallo*, 18 Md. App. 560, 565, 308 A. 2d 457, 460 (1973); *Mullinix v. Mullinix*, 12 Md. App. 402, 411-12, 278 A. 2d 674, 678-80 (1971); *Sullivan v. Auslaender*, 12 Md. App. 1, 4-5, 276 A. 2d 698, 699-701 (1971). Upon our review of the record in this case we cannot say that the chancellor was clearly erroneous in his findings of fact or that his ultimate conclusion that custody should be awarded to the father was incorrect.

Ordinarily custody should be changed only when the best interest of the child requires a modification. *Winter v. Crowley, Jr.*, 231 Md. 323, 331, 190 A. 2d 87, 91 (1963); *Peterman v. Peterman*, 14 Md. App. 310, 320-21, 286 A. 2d 812, 819 (1972); *Sullivan, supra*, at 12 Md. App. 5, 276 A. 2d 701. In determining what is likely to be in the best interest and welfare of a child, a court may properly consider, among other things, the fitness of the person seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the children, the physical, spiritual and moral well-being of the children, the environment and surroundings in which the children will be reared, the influence likely to be exerted upon the children, and if old enough to make a rational choice, the preference of the children themselves. *Hild v. Hild*, 221 Md. 349, 357, 157 A. 2d

442, 446 (1960); *Deckman v. Deckman,* 15 Md. App. 553, 565-66, 292 A. 2d 112, 118-19 (1972).

The record shows that all three children lived with their mother after the parties' separation in 1967. While the chancellor did not find the mother to be unfit, there was evidence to show that the mother, then working full-time as a nurse and staff development director at Maryland General Hospital, had a history of repetitive occurrences of mental depression, suicide attempts, and alcoholism problems, which ultimately required long-term psychiatric hospitalization. Although she had greatly improved, she still drank occasionally and was prone to hysterical exaggeration. Because she frequently attended Alcoholics Anonymous meetings and evening college classes in addition to working full-time, she spent such a considerable time away from the children that they had virtually no maternal supervision. In addition, there was a lack of involvement on her part in the children, their interests, and their emotional development.

There was evidence to show that the children were doing well. Both Theresa and Priscilla had been honor students at their respective schools the year before; Theresa was a high school cheerleader. Yet the probation officer's report shows that Priscilla was recently suspended from junior high school and was becoming prone to temper outbursts; that neither of the children got along well with their older sister Pamela; and that Priscilla was not getting along well with her mother.

Finally, there was evidence to show that the father, a urologist, was a conscientious man, deeply concerned and involved in the welfare of the children; that he then lived in a spacious, attractively furnished two bedroom apartment which he shared with his 79 year old widowed mother; that he was then willing and able to obtain even more commodious accommodations if custody were granted to him; that during the years since the separation of the parties the father had spent four nights a week with the children and was generally available to them on call; that Theresa wanted to be in her father's custody; that Priscilla wanted to

be with Theresa; and that, in the opinion of the probation officer, the father is "presently more able to provide the most stable and consistent atmosphere for the girls."

We agree with the chancellor's conclusion that custody of these children should be awarded to the father. Priscilla's difficulties at school, her inability to get along well with her mother, the inability of both children to get along with Pamela, and Theresa's decided preference to be with her father, coupled with the fact that since 1967 the father has been more integrally involved with the children than has the mother, are all factors which demonstrate that a change in custody is in the children's best interest. The strong paternal influence and involvement which the father offers far outweighs any disadvantage which may be suffered by transferring custody of the children to him. Accordingly, the chancellor's determination with respect to the custody of the children will be affirmed.

## II

The mother additionally contends that she was entitled to support payments, including college expenses, for Pamela, notwithstanding the fact that Pamela had become 18 years old in January, 1974, and was, therefore, no longer a minor at the time of the award in July, 1974. She asserts that before 1 July 1973, the effective date of Art. I, § 24, which changed the age of majority from 21 to 18 years, the father had verbally agreed to support the children and that that agreement meant that he agreed to support the children until they reached the age of 21. The father contends that before 1 July 1973 there was no agreement to support the children until age 21 and in the absence of any support agreement or court decree executed or entered into prior to 1 July 1973, the mother was not entitled to child support for Pamela.

The record shows that the parties separated in August, 1967. According to the mother, the parties after discussion verbally agreed, sometime in September or October, 1967, that the father should pay the mortgage, utilities and

insurance expenses as well as $150.00 every two weeks as support for the three children. The mother testified that payments in accordance with this agreement were made until January, 1974, at which time the father ceased making support payments for Pamela who then became 18 years old and who was attending college.

While the father testified that at the time of the separation of the parties he and the mother were both represented by counsel, and while no formal written separation agreement making disposition of the property of the parties was introduced into evidence, the father at no time during the trial denied the existence of an agreement with respect to child support as testified to by the mother. Moreover, he himself testified that from the time of the separation of the parties in August, 1967, he paid $150.00 every two weeks for the three children and, in addition, another $150.00 per month for utilities, the mortgage and "a number of other things." Finally, he testified that, whereas he intended and hoped to contribute to the cost of a college education for his daughters Theresa and Priscilla, he would not contribute to Pamela's education for the sole reason that "my wife had enough money that if she had been prudent she could have paid for Pamela's education. She should have taken care of that during that period."

Here the evidence presented compels the conclusion that an agreement between the parties with respect to support payments for the three children did exist long before 1 July 1973, the effective date of Art. I, § 24. There is no requirement that there be a formal written agreement in matters involving separation, alimony, child support and custody. *Wilner v. Wilner*, 251 Md. 13, 24, 246 A. 2d 273, 279 (1968); *Hahn v. Hahn*, 192 Md. 561, 568, 64 A. 2d 739, 742 (1949).[2] The existence of an agreement with respect to such

---

2. Parol agreements for child support are not violative of the Statute of Frauds' requirement that agreements not to be performed within a year must be in writing. It is possible that the child will die within the year so that the contract would be fully performed. Wilhelm v. Hardman, 13 Md. 140, 149 (1859); Ellicott v. Turner, 4 Md. 476, 487-91 (1853); Wooldridge v. Stern, 42 F. 311, 312-15 (8th Cir. 1890); Beattie v. Traynor, 49 A. 2d 200, 201-03 (Vt. 1946); 2 *A. Corbin, Contracts,* § 446, at 549 (1950).

matters may be verified from testimony, the conduct of the parties, and other evidence in the case. *Wilner, supra,* at 251 Md. 24, 246 A. 2d 279. Here the mother's acceptance of payments unilaterally determined by the father to be appropriate, for a period of six years, without resort to a support action, constitutes acquiescence in and acceptance of an offer of support for the children made by the father, and, therefore, constitutes an agreement between the parties with respect to support payments for the three children. *See Eckard v. Gardner,* 255 Md. 171, 178, 257 A. 2d 174, 177 (1969); *Rethorst v. Rethorst,* 214 Md. 1, 15, 133 A. 2d 101, 109 (1957).

Moreover, the fact that these parties, each of whom were represented by counsel from the time of their separation in August, 1967, never entered into or executed a formal written separation agreement, making final disposition of all their property rights, does not establish that the parties previously had not effectuated an agreement with respect to child support. Even a temporary measure providing for child support pending the completion of negotiations between parties' counsel, concededly nothing more than an interim measure which does not purport to make a final determination of property rights, is nonetheless a valid and enforceable agreement. *Wilner, supra,* at 251 Md. 24-25, 246 A. 2d 279.

Here both the father and mother testified as to facts which support a rational inference that an agreement with respect to the support of the children did in fact exist prior to 1 July 1973. There was no denial by the father of the existence of that agreement. Although the chancellor made no finding with respect to the existence of such an agreement, the corroborated evidence supports such a finding. A finding to the contrary, had one been made, would have been clearly erroneous.

On the basis of the record before us we are persuaded that an agreement between the parties with respect to the support of their three children, which required the husband to pay $25 per week per child, did, in fact, exist before 1 July

1973, the effective date of Art. I, § 24.[3] The question next to be resolved is whether, by virtue of that agreement, and notwithstanding the provisions of Art. I, § 24 which made 18 rather than 21 the age of majority, the father was obligated to support Pamela after she reached the age of 18 in January, 1974.

Article I, Section 24 provides:

"(a) Except as otherwise specifically provided by statute, a person eighteen years of age or more is an adult for all purposes whatsoever and has the same legal capacity, rights, powers, privileges, duties, liabilities; and responsibilities as prior to July 1, 1973, persons had at twenty-one years of age, and the 'age of majority' is hereby declared to be eighteen years.

"(b)(1) The terms 'adult,' 'of full age,' or 'of legal age' refer to persons who have attained the age of eighteen years.

"(2) The term 'minor,' as it pertains to legal age and capacity, refers to persons who have not attained the age of eighteen years."

Section 51 stipulates:

"That the provisions of this Act shall be construed only prospectively and shall not be applied or interpreted to have any effect upon or application to *any event or happening occurring prior to the effective date of this Act,* or to any gift made under the Uniform Gift to Minors' Act prior to that date, or to any court decree, trust, will, deed or other instrument in effect prior to the effective date of this Act." (Emphasis added.)

---

**3.** Because the evidence regarding the conduct of the parties and the agreement is uncontradicted and uncontroverted and because the testimony of both parties establishes the existence of such an agreement, a finding to that effect is not dependent on the credibility of the witnesses. Thus, we find it unnecessary to remand the case, under Maryland Rule 1071, for a determination by the chancellor. *See* Donigan v. Donigan, 208 Md. 511, 520-21, 119 A. 2d 430, 434 (1956).

Section 52 of the Act provides that the Act shall take effect 1 July 1973.

The impact of Art. I, § 24 on a parent's obligation to provide child support has been considered in Maryland on three occasions. The Court of Appeals in *Monticello v. Monticello*, 271 Md. 168, 315 A. 2d 520 (1974), initially determined the effect of Art. I, § 24. There a part of a divorce decree, entered in 1968, ordered a father to pay support for his three "infant children." In construing Section 1 in conjunction with Section 51, the court said at 271 Md. 173, 315 A. 2d 523:

> ". . . [w]e are prepared to hold that the use of phrases such as 'infant' child, 'minor' child, 'during infancy,' 'during minority,' 'until attaining majority,' or 'until age of majority,' *in an agreement* or in a decree relating to child support dated prior to 1 July 1973, must have meant support until attaining age 21, in the absence of a clear expression of contrary intent, since this is the only meaning which could reasonably have been within the contemplation of the parties at the time such an agreement was executed, or in a judge's mind when such a decree was entered. *However, we do not decide whether this holding governs the interpretation of an agreement or decree which refers to 'child' or 'children,' otherwise unidentified, or to a child by name, without further elaboration from which intent can be inferred.*" (Emphasis added.)

The same result was reached by this Court in *O'Connor v. O'Connor*, 22 Md. App. 519, 522, 323 A. 2d 632, 634 (1974), in which this Court considered a decree entered in 1971 which required the father to pay support for the "minor children" of the parties and in *Abb v. Crossfield*, 23 Md. App. 232, 237-38, 326 A. 2d 234, 238 (1974), in which this Court considered a 1963 support order, based on a pre-existing agreement of the parties that expressly obligated the father

to provide support for a child "until the said child reaches her 21st birthday or becomes self-supporting." Neither of these cases decided the question eschewed by the Court of Appeals in *Monticello* and now squarely before us concerning the impact of Art. I, § 24 on a preexisting oral agreement relating to child support which refers to "child" or "children" otherwise unidentified, or to a child by name without further elaboration.[4]

Since we are here concerned with the construction and interpretation of an agreement for child support we follow the objective law of contracts which requires us to determine, from the language of the agreement itself, what a reasonable person in the position of the parties would have thought the agreement meant at the time it was effectuated. *Monticello, supra,* at 271 Md. 173, 315 A. 2d 522-23; *Slice v. Carozza Properties, Inc.,* 215 Md. 357, 368, 137 A. 2d 687, 693 (1958). The same principle would, of course, be followed if we were concerned with a similarly worded judicial decree imposing child support. *Monticello, supra,* at 271 Md. 173-74, 315 A. 2d 523. The agreement here, whether viewed as arising from the verbal assent of the parties or from their conduct, is an agreement by which the father undertook to pay $150 every two weeks for the three "children."

The agreement contained no express provisions as to when the payments might terminate. Nor did it contain any express provisions as to any contingencies upon which the payments might terminate. In the absence of any specific provisions for the termination of payments only two

---

4. While some 30 states have lowered their age of majority since 1964, Wilner, *Family and Juvenile Law — Section Report,* 6 Md.Bar J., No. 2, at 38-41 (1974), only one state has considered the precise question here presented. In Blackard v. Blackard, 426 S.W.2d 471, 472-73 (Ky. 1968), the Court of Appeals of Kentucky held that where a separation agreement, as related to support payments, provided simply that the payments would be made "until further orders of the court" and did not specifically provide for payment of support until the child "reached the age of majority" there was no evidence of intent that the payments would continue to the then fixed age of majority. The court held that in the absence of any specific contractual intent that payments continue to age 21 the obligation for support ended when the child reached 18. For reasons set forth below we refuse to adopt the rationale and result in Blackard.

interpretations of the agreement are reasonable. Because Pamela, Theresa, and Priscilla will remain the children of their father until the time of his death, the agreement to pay $150 every two weeks for the support of "the children" could be viewed as a promise by the father to support the children for the rest of his natural life. Or, because the agreement was made by married persons living separate and apart, it could be viewed as one designed to satisfy the father's *legal obligation* to support his children, which obligation, under then existing law, required him to support his children until they reached the age of 21. The fact that the agreement contains no express provision for termination of payments does not permit it to be viewed as one allowing the father to terminate payments at any time. Such an interpretation would, in essence, view the father's promise as one to provide payments so long as he was willing so to do, a view which negates the very existence of an agreement because of the illusory nature of the father's promise. *See Stamatiades v. Merit Music,* 210 Md. 597, 614-15, 124 A. 2d 829, 838 (1956); *Foster-Porter Enterprises v. De Mare,* 198 Md. 20, 30-31, 81 A. 2d 325, 331 (1953).

We think it obvious that in 1967 reasonable married persons, who had separated and had entered into an agreement for the support of their children, would have thought that that agreement was an agreement designed to satisfy, without the need of a court adjudication, the legal obligation of the supporting parent to his children, an obligation which at that time required support until the age of 21. We now hold that the use of words such as "child" or "children" otherwise unidentified, or a reference to a child by name, without further elaboration, in an agreement or in a decree relating to child support, dated prior to 1 July 1973, in the absence of a clear expression of contrary intent must have meant support for the parties' offspring at least until they attain the age of 21. The only meaning, which could reasonably have been within the contemplation of the parties at the time such an agreement was effectuated, was one that required support to be continued at least until the child attained 21 years of age. The same would be true for a

similarly worded judicial decree providing for child support entered before the effective date of Art. I, § 24.

Such a holding is consonant with the provisions of Section 51, which direct that the "Act shall be construed only prospectively and shall not be applied or interpreted to have any effect upon or application to any event or happening occurring prior to the effective date of this Act." It is also consistent with the well-known maxim of the law that when a contract is ambiguous the intent of the parties at the time it was entered into controls the interpretation of the contract, *Hardy v. Brookhart,* 259 Md. 317, 326-27, 270 A. 2d 119, 125 (1970); *Garfinkel v. Schwartzman,* 253 Md. 710, 720, 254 A. 2d 667, 673 (1969), and with the familiar principle that constitutional and statutory provisions in effect at the time a contract is made become a part of the contract, *Denise v. Spotswood I. Quimby, Inc.,* 248 Md. 428, 433-34, 237 A. 2d 4, 7 (1968); *Holmes v. Sharretts,* 228 Md. 358, 367, 180 A. 2d 302, 306 (1962). This holding also comports with the rule of statutory construction and constitutional law that disfavors a construction which will impair existing rights and/or the obligations of existing contracts or will effect the retroactive operation of a statute. *Dryfoos v. Hostetter,* 268 Md. 396, 407-08, 302 A. 2d 28, 34 (1973); *Dixon v. Checchia,* 249 Md. 20, 23, 238 A. 2d 247, 249 (1968); *Janda v. General Motors Corp.,* 237 Md. 161, 169, 205 A. 2d 228, 232 (1964); *Beechwood Coal Co. v. Lucas,* 215 Md. 248, 253-54, 137 A. 2d 680, 683 (1958); *Equitable Trust Co. v. Smith, Trustee,* 26 Md. App. 204, 210, 337 A. 2d 205, 208. In addition such a holding has the salutary effect of providing consistency of treatment for all agreements and decrees relating to child support in effect before the effective date of the Act, irrespective of the presence or absence of words or phrases used to describe the children. It thus promotes fairness and protects children by assuring that their right to support is not dependent upon the chance wording of an agreement or a decree effectuated at a time when the inclusion or exclusion of words and phrases such as "minor," "minority," "infant," or "infancy" had no significance. *See Shelley v. Smith,* 249 Md. 619, 627, 630-31, 241 A. 2d 682, 686,

688 (1968); *Staley v. Staley*, 25 Md. App. 99, 105, 335 A. 2d 114, 118-19.[5]

The chancellor, having correctly determined that Pamela was 18 at the time of his award, made no finding with respect to her entitlement to support although the father's contractual liability for her support had not yet terminated. In our opinion the equity court had power to enforce specifically the agreement between husband and wife and should have done so. *Schacter v. Schacter*, 251 Md. 304, 308-10, 247 A. 2d 268, 271 (1968); *Zouck v. Zouck*, 204 Md. 285, 295-96, 104 A. 2d 573, 576-77 (1954); *Offutt v. Offutt*, 106 Md. 236, 241, 67 A. 138, 139-40 (1907); *Helms v. Franciscus*, 2 Bland Chancery 544, 564 (1830); *McClure v. McClure*, 15 Md. App. 226, 289 A. 2d 610 (1972). In *Zouck, supra*, at 204 Md. 296, 104 A. 2d 577-78, the Court of Appeals said:

"A court of equity will not require specific performance, as a matter of course. It will evaluate the conduct of the parties, the circumstances and the equities of each particular case. It will not use its discretion to grant the remedy unless its exercise will subserve the ends of justice and the result of its assistance is fair, just and reasonable. We think that the Court did not err in finding the contract in the instant case met the standards necessary for specific performance. Zouck did not deny the execution of the agreement or claim that it was procured by fraud or duress. He did not challenge the fairness of the amount he agreed to

---

5. The virtue of consistent and uniform treatment of agreements and decrees relating to child support in effect before the effective date of an act lowering the age of majority has been recognized in a number of states. In such states, courts considering the question of the retroactive application of statutes lowering the age of majority upon agreements or decrees relating to child support, which contained words modifying phrases such as "child" or "children," avoided the creation of distinctions between agreements and decrees including and excluding such words by the simple device of holding that such laws are not retroactive and do not apply to any decrees or agreements entered before the effective date of the act lowering the age of majority. Baker v. Baker, 498 P. 2d 315, 319 (Wash. 1972); Vicino v. Vicino, 298 A. 2d 241, 244 (Conn. Sup. 1972); Finn v. Finn, 294 So. 2d 57, 59 (Fla. App. 1974).

pay nor claim that he was unable to pay it, or that its payment would be a hardship on him. A court, of course, is not bound in the amount fixed by the parents for the support of a child. It is free to adopt the amount agreed upon and incorporate it in its decree as its own, but it is not bound to do so. Here, the chancellor followed the permissible course, of adopting the amount agreed upon as fair and reasonable, the expression of such adoption being the enforcement of the contract so providing. Under the facts of the case, we think this course of action was fully justified."

Here, as in *Zouck*, the father did not at trial deny the execution of the agreement or claim that it was procured by fraud or duress. He did not challenge the fairness of the amount he agreed to pay nor claim that he was unable to pay it, or that its payment would be a hardship upon him. We find that the chancellor erred in failing to exercise his discretion and to enforce specifically the agreement by adopting the amount agreed upon as fair and reasonable and by requiring payment of both the amount then due and unpaid and that to be paid in the future.

In addition, in our view, Pamela was entitled to an order requiring the payment of her college expenses so long as she remained in college and until she reached the age of 21, notwithstanding the fact that at the time the chancellor made his award she was over the age of 18. The instant suit for divorce, custody and child support was filed on 29 June 1973, two days before the effective date of Art. I, § 24, and at a time when Pamela was only 17 years of age.

Ordinarily, a court that has acquired jurisdiction of a case will not be deprived of its jurisdiction by subsequent events in the course of its proceedings, even if such subsequent events are of such a character as would have prevented jurisdiction from attaching in the first instance. *Automatic Retailers of America, Inc. v. Evans Cigarette Service Company*, 269 Md. 101, 105, 304 A. 2d 581, 584 (1973); *Ledford Construction Co. v. Smith*, 231 Md. 596, 599-600, 191 A. 2d 587, 589 (1963); *Thompson v. State*, 26 Md. App.

442, 448, 338 A. 2d 411, 414; *Gray v. State,* 6 Md. App. 677, 682, 253 A. 2d 395, 398 (1969); *Collins v. Robbins,* 84 A. 2d 536, 538 (Me. 1951); 20 Am.Jur.2d *Courts,* § 148 (1965).We believe that this rule should be applied in this case.

At the time this suit was filed, the court, having jurisdiction of the subject matter, had the obligation and the power to protect Pamela's best interest by determining the appropriate amount of money to be paid for her support during her minority which then connoted the period until age 21. The court thus had a number of alternatives available to it, among which were: (1) the power to incorporate into a decree the agreement then existing between her parents for the payment of $25 per week for her support until she reached the age of 21, *Pumphrey v. Pumphrey,* 11 Md. App. 287, 291-92, 273 A. 2d 637, 640 (1971); and (2) the power to modify the contract by increasing the amount of the payments, *Tvardek v. Tvardek,* 257 Md. 88, 97, 261 A. 2d 762, 767 (1970); *Bebermeyer v. Bebermeyer,* 241 Md. 72, 77, 215 A. 2d 463, 466 (1965); *Stern v. Horner,* 22 Md. App. 421, 429-33, 324 A. 2d 134, 138-40 (1974); Maryland Code (1957, 1973 Repl.Vol.) Art. 16, §§ 25, 28, 66 (a) [Art. 16, § 66 (a) now codified in *Courts Article* (1974), § 3-602]. Had the court exercised its power promptly, and before Pamela became 18 in January, 1974, she would have been protected until age 21, not by a contract for an amount of support agreed upon by her parents, enforceable in civil actions for breach of contract and/or for specific performance, but rather by a court decree entitling her until age 21 to support payments judicially determined to be adequate, to subsequent court review and modification as circumstances changed, and to enforcement through the court's power of contempt. To hold under the present circumstances that, as a consequence of the enactment of Art. I, § 24, the equity court lost jurisdiction to enter such a decree once Pamela had reached the age of 18 would result in the total deprivation of the substantial rights she possessed by virtue of filing of the suit for child support, an event which occurred two days before the enactment of Art. I, § 24. Such a result is contrary to Section 51 which specifies that the Act should not be applied

in such a way as to have "any effect . . . upon any event or happening" occurring before the effective date of the Act. Moreover, such a result is inconsistent with the role of the court as a protector of the child. An equity court has a substantial interest and particular concern in the welfare of children, and while these courts are not a party to custody or support proceedings they do stand as parents patriae to the child when the jurisdiction of the court is invoked. *Taylor v. Taylor*, 246 Md. 616, 621, 229 A. 2d 131, 135 (1967); *Jackson v. Jackson*, 13 Md. App. 725, 733-34, 284 A. 2d 654, 658-59 (1971); *Myers v. Butler*, 10 Md. App. 315, 316, 270 A. 2d 341, 342 (1970). Here an equity court's failure to act with dispatch cannot be permitted to deprive a child of its rights. Consequently, we believe that the chancellor erred in failing to consider Pamela's entitlement to support, including her college expenses.

Ordinarily the amount to be awarded for child support is governed by the circumstances of the case and is entrusted to the sound discretion of the chancellor, whose determination should not be disturbed on appeal unless he arbitrarily used his discretion or was clearly wrong. *Blumenthal v. Blumenthal*, 258 Md. 534, 540-41, 266 A. 2d 337, 340; *Pet v. Pet*, 238 Md. 492, 496, 209 A. 2d 572, 574 (1965); *Gosman v. Gosman*, 19 Md. App. 66, 83, 309 A. 2d 34, 43, *rev'd on other grounds*, 271 Md. 514, 318 A. 2d 821 (1974); *Lott v. Lott*, 17 Md. App. 440, 450, 302 A. 2d 666, 672 (1973). The factors which he should consider in awarding child support include the financial circumstances of the parties, their station in life, their age and physical condition, their ability to work, and the expense of educating the children. *Bowis v. Bowis*, 259 Md. 41, 43-44, 267 A. 2d 84, 86 (1970); *Smith v. Smith*, 227 Md. 355, 361, 176 A. 2d 862, 866 (1962); *Flood v. Flood*, 16 Md. App. 280, 285, 295 A. 2d 784, 787 (1972); *Quinn v. Quinn*, 11 Md. App. 638, 643-44, 276 A. 2d 425, 427, *cert. denied*, 262 Md. 749 (1971). The supporting parent's financial ability and the needs of the children are the controlling factors. *Rothchild v. Strauss*, 257 Md. 396, 397, 263 A. 2d 511, 512 (1970); *Wagshal v. Wagshal*, 249 Md. 143, 147-48, 238 A. 2d 903, 906 (1968); *Chalkey v. Chalkey*,

240 Md. 743, 744, 215 A. 2d 807, 808 (1966); *Richardson v. Richardson*, 17 Md. App. 665, 667, 304 A. 2d 1, 8, *cert. denied,* 269 Md. 765 (1973); *Fainberg v. Rosen*, 12 Md. App. 359, 369, 278 A. 2d 630, 635 (1971).

Here the record shows that the father, age 51, is a medical doctor, holding the position of chief of urology at one of the United States Veterans' Hospitals in Baltimore, who receives a salary of $35,799 annually plus a yearly pension of about $1,200. The mother, age 49, is a registered nurse who holds the position of staff development director at the Maryland General Hospital in Baltimore, in which capacity she is responsible for the selection and training of nursing and office personnel. She receives a salary of $12,700 a year. Both parties are in relatively good physical health although the mother previously suffered severe psychological difficulties, and is presently suffering from difficulties with her back. Since both the mother and the father are professionals it is obvious that they have each enjoyed a considerable amount of schooling beyond the high school level.

Yet the father, who agreed to support Pamela until age 21, has impeded her efforts to obtain a college education by refusing to pay either for her support or her college expenses. Simultaneously he brashly assured the trial court that he intended to provide and was financially able to provide a college education for his two younger daughters, Theresa and Priscilla, whose custody he then sought and, in fact, obtained. An uncontradicted expense statement submitted by the mother indicates that Pamela's general living expenses have risen in recent years and that Pamela, who is living with her mother while attending Towson State College, now required $114 per month for the sole purpose of paying for her college tuition and other college associated needs.

There can be no question under the present circumstances that a college education is a necessary incident of Pamela's station in life, the cost of which is, therefore, a part of the father's legal obligation to support her until she reaches the

age of 21. *Wooddy v. Wooddy,* 258 Md. 224, 231, 265 A. 2d 467, 472 (1970); *Rhoderick v. Rhoderick,* 257 Md. 354, 367-69, 263 A. 2d 512, 519-20 (1970); *Smith, supra,* at 227 Md. 360-61, 176 A. 2d 865-66; *Fainberg, supra,* at 12 Md. App. 368-69, 278 A. 2d 635. It appears that the father has the financial ability to carry out his legal obligation to support Pamela until she reaches the age of 21. Accordingly, we shall remand this case for the chancellor's determination of an appropriate amount for Pamela's support and college expenses until she becomes 21. Maryland Rule 1071.

## III

The mother finally contends that the chancellor erred in failing to award her alimony. She maintains that the father deserted her and that since the separation of the parties and the destruction of the home was attributable solely to the fault of the father she was entitled to an award of alimony.

The Court of Appeals and this Court have recognized fault as one of the several factors to be considered in awarding alimony in divorce suits based on non-culpatory grounds. *Rhoad v. Rhoad,* 273 Md. 459, 465-66, 330 A. 2d 192, 195-96 (1975); *Flanagan v. Flanagan,* 270 Md. 335, 340-42, 311 A. 2d 407, 410-11 (1973); *Renner v. Renner,* 16 Md. App. 143, 159-60, 294 A. 2d 671, 679-80, *cert. denied,* 266 Md. 744 (1962). These courts have made it clear that a party seeking such an award, who is free from fault, is not precluded from obtaining alimony under the appropriate circumstances. It is equally clear that one whose wrongdoing consists of acts which are either adultery or abandonment is not entitled to alimony if such acts are the sole cause of the demise of the marriage, "except in rare instances where there exist extremely extenuating circumstances." *Rhoad, supra,* at 273 Md. 465-66, 330 A. 2d 195; *Flanagan, supra,* at 270 Md. 341, 311 A. 2d 411; *Flood v. Flood,* 24 Md. App. 395, 399, 330 A. 2d 715, 718 (1975).

The Court of Appeals and this Court have consistently held that it is for the chancellor to assess the credibility of the witnesses and determine the weight to be given to the

evidence and that his findings of fact are not to be disturbed on appeal unless clearly erroneous. *Styka v. Styka,* 257 Md. 464, 469, 263 A. 2d 555, 558-59 (1970); *Herring v. Herring,* 251 Md. 516, 518, 248 A. 2d 117, 118 (1968); *Pitts v. Pitts,* 181 Md. 182, 190, 29 A. 2d 300, 304 (1943); *Colburn v. Colburn,* 15 Md. App. 503, 513, 292 A. 2d 121, 127-28 (1972); Maryland Rule 1086. Here the chancellor found that the mother had deserted the father and was not entitled to alimony. The explanation of the events preceding the separation of the parties, offered by the father and others, was sufficient, if believed, to support a finding that the mother abandoned the father and was solely responsible for the destruction of the home. Accordingly, the chancellor did not err in denying the mother alimony.

> *Case remanded for a determination of an appropriate amount for the support of Pamela.*
>
> *Order affirmed in all other respects.*
>
> *Costs to be paid by appellee.*