856 A.2d 703

**Slavomir GLADIS**

v.

**Eva GLADISOVA.**

**No. 127, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 24, 2004.

---

656

Hether L. Akehrst-Krause (Blaine L. Gilbert & Assoc., PA., on brief), Baltimore, for appellant.

Joseph B. Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

We issued a writ of certiorari in this case to determine whether a trial judge, in establishing an amount of child support pursuant to Maryland Code, Sections 12–201 through 12–204 of the Family Law Article (1984, 1999 Repl.Vol., 2002 Supp.) (hereinafter the "Guidelines"), may deviate from the Guidelines to account for the lower cost of raising a child in an area outside of the United States where the cost of living is appreciably less than in Maryland. For the reasons set forth below, we conclude that the Guidelines apply without regard to the lower cost of raising a child in another country.

## I. Background

Slavomir Gladis and Eva Gladisova, both citizens of the Slovak Republic, married in that country on February 20, 1993. Their daughter, Ivana, was born on November 4, 1993. In 1994, Mr. Gladis moved to the United States, and he last saw Ivana in April of 1994.

On March 11, 1998, Mr. Gladis filed a Complaint for Absolute Divorce in the Circuit Court for Baltimore City. On April 24, 1998, the Circuit Court entered a Judgment of Absolute Divorce, granting Ms. Gladisova custody of Ivana and Mr. Gladis the right to see Ivana at reasonable times. The decree

also charged Mr. Gladis with Ivana's general support and maintenance, but it did not specify the amount.

On June 5, 2002, Ms. Gladisova filed a Petition for the establishment of child support in the Circuit Court of Baltimore City pursuant to the Maryland Uniform Interstate Family Support Act (hereinafter "MUIFSA").[1] In accordance with MUIFSA, Ms. Gladisova was represented by the Office of the State's Attorney for Baltimore City, an agency authorized to seek enforcement of child support orders. *See* Code, § 10–319 of the Family Law Article (stating that a support enforcement agency "shall provide services to a plaintiff in a proceeding" under MUIFSA). Mr. Gladis conceded that the Circuit Court for Baltimore City had jurisdiction over the amount of his child support obligation.

On March 4, 2003, a hearing was held in the Circuit Court for Baltimore City before Master Theresa A. Furnari to establish the amount of child support. On May 30, 2003, Master Furnari issued a "Report and Recommendations," in which she found that Mr. Gladis had a high school education,

---

1. MUIFSA, codified under Maryland Code, Sections 10–301 through 10–359 of the Family Law Article (1984, 1999 Repl.Vol.), generally provides that the circuit court may issue an order to establish the child support obligation of a Maryland resident who is responsible for supporting a child residing in another "State." *See* Code, § 10–317(b)(1) (providing the circuit court with the authority to "issue or enforce a support order" "to the extent otherwise authorized by law" when such action has been sought by another "State"). Although the dissent indicates that, "the General Assembly did not intend [the Guidelines] to be utilized in a situation where the custodial parent and child are living outside of the United States," MUIFSA clearly defines a "State" to include "a foreign jurisdiction that has enacted a law or established procedures for issuance and enforcement of support orders which are substantially similar to the procedures under [MUIFSA]." *Id.* § 10–301(t)(2)(ii). The Slovak Republic has enacted a law substantially similar to MUIFSA, as evidenced by the United States' declaration that the Slovak Republic is a "foreign reciprocating state" for purposes of child support enforcement. *See* 42 U.S.C. § 659a (1996) (stating that, if a foreign country has established procedures for the enforcement of child support that are "substantially in conformity" with the statute, the country may be declared a "foreign reciprocating country"); 65 Fed. Reg. 31,953 (2000) (stating that, effective February 1, 1998, the Slovak Republic has been declared a "foreign reciprocating country.").

works as a mechanic at Performance Auto Group, earns $41,773 annually, and has health insurance through his employer. She found that Mr. Gladis lives in Kingsville, Maryland, with his wife, who sells real estate, and their seven month-old child.

The Master found that Ms. Gladisova works as a nurse, earns the equivalent of $430 per month,[2] and pays approximately $2.97 per month for health insurance. She lives in the Slovak Republic with Ivana, her brother, and her parents in her parents' home. According to the Master's Report and Recommendations, Ivana attends fifth grade at a public school located approximately 200 yards from her home. She participates in dance and music programs after school, attends summer camp, skis, bicycles, and plays the organ.

The Master further determined that Mr. Gladis has provided support for Ivana by sending cash, clothes, and school supplies. She found that, in 1998, Mr. Gladis sent $1800 to Ivana through his cousin, who was visiting him and that, in 2001, he sent $1500 to Ivana through another cousin. According to Master Furnari, Mr. Gladis gave his father $2000 to give to Ivana in 2002.

Relying on Ms. Gladisova's financial statements, Master Furnari also found that, including monthly and annual expenses, the total average monthly expense for Ivana's care and support was the equivalent of $275.88 in United States dollars. She recommended that Mr. Gladis pay $300 per month in child support, noting that the amount was a "deviation of $197.00 per month" from the $497 monthly amount that should have been paid under the Guidelines. She concluded that "the deviation [from the Guidelines] is in the best interest of the child as it strikes a balance between [Mr. Gladis'] obligation to contribute to the support of the child [and his] obligation to contribute and meet the needs of his family in the United States and permits the child to benefit from [his]

---

2. The parties had stipulated that one U.S. dollar equals 43.047 Slovak Crowns.

income in the United States." Master Furnari also proposed that Mr. Gladis pay an additional $50 monthly until an arrearage of $1600 was paid in full. The amount of arrearage was calculated as twelve months of retroactive child support payments of $300 per month minus $2000 that Mr. Gladis claimed had been paid in October of 2002. The Master also recommended that Mr. Gladis should be permitted to list Ivana as a dependent on his tax return.

Both parties filed exceptions to Master Furnari's Report and Recommendations. Mr. Gladis disagreed with Master Furnari's calculations of Ivana's monthly expenses based on Ms. Gladisova's financial statement. He maintained, for example, that vaccinations were listed as a monthly expense instead of an annual expense, and that expenses such as an organ, bicycle, and skis are one-time expenses instead of annual expenses. Ultimately, he contended that $233 was the proper child support amount. In Ms. Gladisova's cross-exceptions, she argued, among other things, that the Master erred by deviating from a strict application of the Guidelines.

On August 11, 2003, Judge Edward Hargadon for the Circuit Court for Baltimore City held a hearing to consider the parties' exceptions. On October 17, 2003, the court ordered Mr. Gladis to pay, on an interim basis, $225 in child support, concluding that applying the Guidelines "is inappropriate when there is a wide disparity in the cost of living." The judge found that Ms. Gladisova's actual monthly expenses for Ivana equaled $251.75,[3] an amount significantly less than the $497 monthly payment that the Guidelines would require. Judge Hargadon then referred the case to the Master "for a determination of the costs that would allow Ivana to benefit from [Mr. Gladis'] economic position, so that she may enjoy, in the Slovak Republic, a lifestyle she would have had if her parents had remained together in the United States." The order also called for further findings by the Master regarding

---

3. Judge Hargadon recalculated Ivana's expenses by eliminating certain one-time expenses and by including certain medical and dental expenses as monthly expenses.

whether Mr. Gladis had paid $2000 for Ivana's support in October of 2002.

Ms. Gladisova filed a Motion to Alter or Amend the Circuit Court's Order, which Mr. Gladis opposed. On November 17, 2003, Judge Joseph McCurdy for the Circuit Court for Baltimore City granted Ms. Gladisova's motion and ordered that Mr. Gladis pay $497 per month in accordance with a strict application of the Guidelines, as well as an additional $50 per month toward arrearages of $8,831.13. Judge McCurdy calculation of arrearages represents 77 weeks of retroactive support from the date of Ms. Gladisova's filing through November 30, 2003. The judge then referred the case to the "Domestic Relations Master" for findings on the issue of whether Mr. Gladis was entitled to a credit toward the arrearages for his alleged payment of $2000 in October of 2002.[4]

On December 16, 2003, Mr. Gladis noted an appeal to the Court of Special Appeals, and this Court, on its own initiative and prior to any proceedings in the intermediate appellate court, issued a writ of certiorari. *Gladis v. Gladisova*, 379 Md. 227, 841 A.2d 341 (2004). Mr. Gladis presents two questions:

---

4. Judge McCurdy's order to pay child support was for "the payment of money" and, thus, an "appealable interlocutory order" under Maryland Code, Section 12–303(3)(v) of the Courts and Judicial Proceedings Article (1984, 2002 Repl.Vol.). *Pappas v. Pappas*, 287 Md. 455, 462, 413 A.2d 549, 552 (1980); *accord Frey v. Frey*, 298 Md. 552, 556, 471 A.2d 705, 707 (1984); *cf. Anthony Plumbing of Maryland, Inc. v. Attorney General*, 298 Md. 11, 20, 467 A.2d 504, 508 (1983) (reviewing the history of Section 12–303 and stating that orders for the "payment of money" includes orders in equity such as those arising from "domestic relations litigation"). Judge McCurdy's decision to apply the Guidelines, rather than mitigate the amount to reflect the Slovak standard of living, established the specific amount of child support to be paid monthly. The unsettled factual matter of whether Mr. Gladis had paid $2000 in October of 2002 does not render Judge McCurdy's order unappealable. *See Pappas*, 287 Md. at 457–58, 463, 413 A.2d at 549–550, 552 (holding that a court's orders involving child custody and support were appealable under Section 12–303, even though the orders had not resolved numerous outstanding issues, such as the exact amounts of permanent support, alimony, and counsel fees owed).

1. Whether Judge McCurdy erred in entering the Amended Order dated December 1, 2003, strictly applying the Maryland Child Support Guidelines pursuant to Md. Code Ann. FL § 12–202?

2. Whether Judge McCurdy erred in applying the Maryland Child Support Guidelines without proper consideration to any circumstances [Mr. Gladis] could have asserted for deviation therefrom had he been provided opportunity to do so?

Because a lower cost of living in the child's locality is not a proper basis for deviating from Guidelines, we hold that Judge McCurdy did not abuse his discretion when he determined that the Guidelines establish Mr. Gladis's child support obligation.

## II. Discussion

### A. The Guidelines

The case of *Voishan v. Palma,* 327 Md. 318, 609 A.2d 319 (1992) was the first of our cases involving the Guidelines, and we took the opportunity there to explain what motivated the General Assembly to create them:

The General Assembly enacted these guidelines in 1989 to comply with federal law and regulations. *See* 42 U.S.C. §§ 651–667 (1982 & 1984 Supp. II) and 45 C.F.R. § 302.56 (1989). The federal mandate required that the guidelines be established and "based on specific descriptive and numeric criteria and result in a computation of the support obligation." *Id.* When drafting the guidelines, the Maryland Senate Judicial Proceedings Committee had before it *Development of Guidelines For Child Support Orders: Advisory Panel Recommendations and Final Report,* U.S. Department of Health and Human Services' Office of Child Support Enforcement. This report explained that the need for the guidelines was threefold: (1) to "remedy a shortfall in the level of awards" that do not reflect the actual costs of raising children, (2) to "improve the consistency, and therefore the equity, of child support awards," and (3) to "im-

prove the efficiency of court processes for adjudicating child support."

*Id.* at 322, 609 A.2d at 321 (footnote omitted).

As originally adopted in 1989, the Guidelines were merely advisory. 1989 Md. Laws ch. 2. In 1990, however, the General Assembly amended the Guidelines, making them mandatory. 1990 Md. Laws. Ch. 58. Section 12–202(a)(1) of the Family Law Article now states unequivocally that "the court shall use the child support guidelines" "in any proceeding to establish or modify child support." The Guidelines apply unless the parents' monthly combined adjusted income exceeds $10,000, in which case "the court may use its discretion in setting the amount of child support." *Id.* § 12–204(d); *Voishan,* 327 Md. at 324, 331–32, 609 A.2d at 322, 326. We have stated that "trial court[s] must adhere to the Legislature's plan for calculating the amount and character of a child support award." *See Goldberg v. Miller,* 371 Md. 591, 603–04, 810 A.2d 947, 954 (2002) (citing *Drummond v. State,* 350 Md. 502, 511–12, 714 A.2d 163, 168 (1998); *Walsh v. Walsh,* 333 Md. 492, 498, 635 A.2d 1340, 1343 (1994)).

The Guidelines are based on the Income Shares Model, one of a number of different models recommended to the General Assembly by the Advisory Panel on Child Support Guidelines. *Voishan,* 327 Md. at 322, 609 A.2d at 321. Following the Income Shares Model, the General Assembly created the table in Section 12–204(e), setting forth the basic child support obligation depending on the parents' combined income and number of children. *Id.* at 323, 609 A.2d at 321. In general, if the parents' monthly income does not reach $10,000, "the [child support] obligation is calculated by determining each parent's monthly income, using the table at § 12–204(e) to determine the parents' combined monthly support obligation, and dividing this obligation between the two parents in proportion to their incomes." *Wills v. Jones,* 340 Md. 480, 484–85, 667 A.2d 331, 332 (1995). "The judge must then add together any work-related child care expenses, extraordinary medical expenses, and school and transportation expenses and allocate this total between the parents in proportion to their

adjusted actual incomes." *Voishan*, 327 Md. at 323, 609 A.2d at 322 (citing Code, § 12–204(g)–(i) of the Family Law Article). The amount of child support that results from this calculation is presumptively "the correct amount of child support to be awarded." Section 12–202(a)(2)(i); *Walsh*, 95 Md. App. 710, 715, 622 A.2d 825, 828 (1993).

The presumption of correctness may be rebutted by evidence demonstrating that the result under the Guidelines would "be unjust or inappropriate in a particular case." Section 12–202(a)(2)(ii); *Petrini v. Petrini*, 336 Md. 453, 461, 648 A.2d 1016, 1019 (1994). In determining whether a child support award is unjust or inappropriate, courts may consider a number of factors enumerated by the Guidelines, including:

1. the terms of any existing separation or property settlement agreement or court order, including any provisions for payment of mortgages or marital debts, payment of college education expenses, the terms of any use and possession order or right to occupy to the family home under an agreement, any direct payments made for the benefit of the children required by agreement or order, or any other financial considerations set out in an existing separation or property settlement agreement or court order; and

2. the presence in the household of either parent of other children to whom that parent owes a duty of support and the expenses for whom that parent is directly contributing.

*Id.* § 12–202(a)(2)(iii). The duty to support other children in the household of either parent, however, cannot form the sole basis for rebutting the presumption that the Guidelines establish the correct amount of child support. *Id.* § 12–202(a)(2)(iv).

When a trial court determines that the Guidelines establish an unjust or inappropriate child support amount and then awards an amount of child support that departs from the Guidelines, it is required to "make a written finding or specific finding on the record stating the reasons for departing from the guidelines." *Id.* § 12–202(a)(2)(v). At a minimum, the findings must state what the award would have been under

the Guidelines, how the award varies from the guidelines, and how the finding serves the best interest of the child. *Id.* § 12-202(a)(2)(v)(2).

**B.**

 Child support awards made pursuant to the Guidelines will be disturbed only if there is a clear abuse of discretion. *Voishan,* 327 Md. at 331, 609 A.2d at 326. In this case, Mr. Gladis contends that Judge McCurdy abused his discretion by ordering a child support award based on a strict application of the Guidelines. Mr. Gladis contends that the $497 monthly obligation, as derived from the Guidelines, is "unjust and inappropriate" because the monthly cost of raising Ivana in the Slovak Republic is the equivalent of merely $233.[5] Given the "vast economic disparity" between the United States and the Slovak Republic, Gladis suggests that the trial judge should have departed from the Guidelines and ordered a lesser monthly obligation to account for the lower cost of raising Ivana in her home country.

The State maintains that the Guidelines do not allow for a deviation based on differences in the standards of living in different countries. Moreover, according to the State, Judge McCurdy's application of the Guidelines in this case does not create an unjust or inappropriate child support obligation because the amount "neither excessively burdens Mr. Gladis, inappropriately enriches the child or Ms. Gladisova nor results in an award that is out of proportion to awards routinely computed under the Guidelines."

The only cases that have considered the specific issue raised in this case or a variation of it come from out of state, and we

---

5. Throughout the proceedings below, there have been several different estimates of the monthly cost of raising Ivana in the Slovak Republic. Master Furnari determined it to be $275.88, Judge Hargodon thought it was $251.75, the State suggests it is $243.45, and Mr. Gladis conceded that it was at least $233.00. The exact amount is not relevant, however, because both parties agree that Mr. Gladis's child support obligation, as determined by the Guidelines, far exceeds the cost of raising Ivana in the Slovak Republic.

have discovered only a few. At least two courts in our sister states have determined that differences in the standard of living in different geographic areas do not justify a deviation from statutory child support guidelines. In *In re Marriage of Beecher*, 582 N.W.2d 510 (Iowa 1998), the Supreme Court of Iowa held that the non-custodial father's increased cost of living in California did not justify a departure from the child support award calculated under Iowa's child support guidelines. The trial court had reduced the amount awarded under the guidelines based on the father's argument that his cost of living had increased when he moved from Iowa to California and purchased a more expensive home. *Id.* at 512. In reversing the trial court's judgment, the court stated:

> We do not find any special circumstances in this record justifying a downward departure form the guidelines. [The father's] move to California was for a higher paying job. His increased income inured to the benefit of his sons and results in the corresponding increase in the amounts due for their support under the guidelines. The more expensive home in California was intended to benefit the boys. Both the income and more expensive home however also inured to [the father's] own benefit. *The California home and the higher living cost there are not grounds for departure from the guidelines.*

*Id.* at 514 (emphasis added).

In a case that is more on point, *Edwards v. Dominick*, 815 So.2d 236 (La.App.2002), the non-custodial father contended that his child support obligation should be less than the amount established by Louisiana's statutory child support guidelines because his daughter's standard of living in South Africa differed from the standard of living in Louisiana. *Id.* at 239. The court rejected the argument for two reasons. First, the court stated that the father did not present evidence of an amount of child support that would be adequate for the support of a child in South Africa. *Id.* Second, the court observed that the father "failed to cite any Louisiana law to support his argument that the standard of living in the place where the minor child resides is a relevant factor in determi-

nation of the child support obligation." *Id.* Based on these reasons, the court held that "there is no indication from the record before us that the application of the guidelines would not be in the best interest of the child or would be inequitable to the parties...." *Id.*

Other out-of-state courts have held that deviation from the guidelines may be appropriate based on the standards of living in different localities. In *Booth v. Booth,* 44 Ohio St.3d 142, 541 N.E.2d 1028 (1989), for example, the court reviewed an award of child support and addressed particularly whether the trial court could deviate from the guidelines based on the different standards of living in Ohio and New York. *Id.* at 1030. Upholding the award, the court concluded that deviation from the guidelines based on the husband's high cost of living in New York was permissible. *Id.* The court stated, "if we were to assume, *arguendo,* that the trial court had failed to consider the respective costs of living of the parties, it *may* have indeed been 'unreasonable' for the court to ignore such economic realities and, thus, the child support order *might* have amounted to an abuse of discretion." *Id.; see also In re Marriage of Welch,* 273 Mont. 497, 905 P.2d 132, 136 (1995) (holding that the non-custodial parent's higher cost of living in Washington, D.C., if substantiated by "concrete evidence," was an "acceptable reason[ ] for the granting of a variance" from the child support award established by the guidelines); *In re Marriage of Dortch,* 59 Wash.App. 773, 801 P.2d 279, 283 (1990) (noting that the "high cost of living" in the non-custodial parent's domicile "is a consideration which may warrant a deviation from the support schedule....").

In *People ex rel. A.K.,* 72 P.3d 402 (2003), the non-custodial parent sought a deviation from Colorado's presumptively correct child support guidelines on the basis that his children, who lived in Russia, sustained "economic circumstances" that were "very different from those on which the guidelines are based." *Id.* at 404. Considering evidence that certain expenses of the child would be "vastly greater" in Russia than in Colorado, the trial court refused to lower the child support obligation established by applying the guidelines. *Id.* at 404–

**668**

05. Nevertheless, the appellate court remanded the case, concluding that the trial court, in "deciding whether application of the guidelines 'would be inequitable, unjust, or inappropriate,' " should have considered evidence presented by the custodial parent that the children's expenses in Russia were significantly lower than the award calculated under the guidelines. *Id.* at 405.[6]

■ Although we recognize that the state courts addressing the issue have conflicting views on the subject, we believe that the better position is to prohibit courts from deviating from the Guidelines based on the standards of living in different areas. This conclusion is most consistent with the principles underlying Maryland's child support law. The Guidelines reflect the Legislature's plan for determining child support, and the courts must follow that plan. *See Goldberg,* 371 Md. at 603–04, 810 A.2d at 954 (citing *Drummond,* 350 Md. at 511–12, 714 A.2d at 168; *Walsh,* 333 Md. at 498, 635 A.2d at 1343). The Guidelines were intended to ensure that awards sufficiently met the needs of children, improve the consistency and equity of awards, and improve the efficiency of the processes for adjudicating child support. *Voishan,* 327 Md. at 322, 609 A.2d at 321. To carry out these goals, the carefully crafted provisions of the Guidelines establish consistent awards notwithstanding what differences may exist in the standards of

6. In *People ex. rel. A.K.,* some of the evidence that was ignored at trial had nothing to do with the different standards of living in Colorado and Russia. The trial court had not considered that the father "provided and fully paid for a residence for the children, an expense that is included in the guidelines' presumptive amount for reasonable and necessary child support." *Id.* at 405. In other words, the appellate court was concerned that the application of the child support guidelines accounted for expenses for which the father had already provided. Thus, the different standards of living in Colorado and Russia were not the only reasons why the court believed the application of the guidelines may have been unjust or inappropriate.

The case of *In re Marriage of Andersen,* 895 P.2d 1161 (Col.App.1995) confirms that a deviation from the Colorado guidelines must be supported by more than just evidence of different standards of living in different localities. There, the court noted "that a finding that one parent has a higher cost of living will not, in and of itself, ordinarily justify deviating from the guidelines." *Id.* at 1164.

living in different geographic areas. Simply put, the General Assembly did not make one's geographical standard of living part of the child support formula.

In addition, the General Assembly enacted the Guidelines based on the premise that "a child should receive the same proportion of parental income, and thereby enjoy the standard of living, he or she would have experienced had the child's parents remained together." *Voishan*, 327 Md. at 322, 609 A.2d at 321. In *Voishan*, we underscored this foundational concept and rejected the father's argument that his child was entitled only to the maximum amount of support as set forth in the table under Section 12–204(e), even though the parents' combined monthly income exceeded $10,000. *Id.* at 325, 609 A.2d at 322–23. We held that, in an above-guidelines case, the schedule under Section 12–204(e) "could provide a presumptive *minimum* basic award," but the legislature did not intend "to cap the basic child support obligation at the upper limit of the schedule." *Id.* at 325, 609 A.2d at 323. Rather, the child of parents who earn *more* than $10,000 per month may be entitled to a higher standard of living and more child support than a child of parents who earn *exactly* $10,000 per month. *Id.* at 326, 609 A.2d at 323.

This rationale applies with equal force in the case at bar. Here, like in *Voishan*, the child support award would allow the child to enjoy an above-minimum standard of living that corresponds to the father's economic position. There is no question in the present case that Judge McCurdy's award of child support exceeds the *minimum* of what is needed to live normally according to the Slovak Republic's standards. We have made clear, nonetheless, that "a child should receive the same proportion of parental income, and thereby enjoy the standard of living, he or she would have experienced had the child's parents remained together." *Voishan*, 327 Md. at 322, 609 A.2d at 321. Had Mr. Gladis and Ms. Gladisova remained together (in Maryland), Ivana would have enjoyed certain amenities that are generally not available in her native country. The increased amount of child support will allow Ivana to experience some of those same amenities, allowing her to

experience a lifestyle that corresponds more closely to the economic position of Mr. Gladis. The child support calculated under the Guidelines, therefore, only serves Ivana's best interests and is the appropriate measure of Mr. Gladis's obligation.

Further, one of the primary purposes of the Guidelines "was to limit the role of trial courts in deciding the specific amount of child support to be awarded in different cases by limiting the necessity for factual findings that had been required under pre-guidelines case law." *Petrini,* 336 Md. at 460, 648 A.2d at 1019. Allowing a deviation from the Guidelines based on the standards of living in different localities would encourage trial courts to examine those circumstances on a case-by-case basis and, no doubt, depart from the guidelines more frequently. How, for instance, could fact finders consistently determine the precise differences in the standards of living in two different countries, given that the value of currency changes constantly and that middle-class living conditions in Maryland may be considered poverty or extravagance elsewhere? If this complex inquiry becomes a factor in determining child support awards, it "would only serve to make the support awards less uniform and predictable and more subject to individual whim and manipulation." *See In re Marriage of Andersen,* 895 P.2d at 1164 (quoting the Colorado Child Support Commission Report (1991)). This is the very result the General Assembly hoped to avoid in enacting the Guidelines. Consequently, for the sake of continued consistency in child support awards and to ensure that a child enjoys the same standard of living as the parents had they remained together, we hold that the lower cost of raising a child in a different country or state does not justify a downward deviation from the Guidelines. Judge McCurdy, therefore, did not abuse his discretion in ordering Mr. Gladis to pay an amount of child support according to a strict application of the Guidelines.

Although no Maryland case has addressed the specific issue raised in this case, the Court of Special Appeals, not long ago, faced an analogous question in *Smith v. Freeman,* 149 Md. App. 1, 814 A.2d 65 (2002). The reasoning in that case is

consistent with our holding here. In *Smith,* Freeman, a professional football player, sought to prevent an increase to his child support obligation based on an annual salary boost from $1.2 to $3.2 million dollars. *Id.* at 17–18, 814 A.2d at 74–75. The trial court had determined that the salary increase did not constitute a material change in circumstances warranting modification of the child support award. *Id.* at 10, 814 A.2d at 70. The Court of Special Appeals disagreed, however, and remanded the case for consideration of those changes in circumstances. *Id.* at 30, 814 A.2d at 82.

The Guidelines did not apply in *Smith* because the parties' income exceeded $10,000 per month, but the Court of Special Appeals discussed an issue that is very relevant to the instant case: When the child and non-custodial parent have two different standards of living, which standard should determine the amount of the child's support? *Id.* at 31, 814 A.2d at 82. For guidance to the trial court on remand, the court reviewed a number of cases involving wealthy non-custodial parents who objected to child support payments beyond what they considered to be the "needs" of the children. Judge Hollander for the court observed:

> The cases cited above recognize that the concept of "need" is relative, almost metaphysical, and varies with the particular circumstances of the people involved, as well as their culture, values, and wealth. To be sure, many people, adults and children alike, have far more than they truly "need" to survive, or even to live comfortably. On the other hand, there is virtually no limit to the luxuries that many extremely wealthy celebrities seem to enjoy regularly. Even among middle class populations, there is a range of tastes with varying costs. While some Marylanders are amply satisfied with a vacation in Ocean City, others prefer to vacation in places like Martha's Vineyard, despite the fact that both beaches front on the Atlantic Ocean. Simply put, given a choice between rhinestones and rubies, many people opt for the latter if they can afford to do so.

*Id.* at 32, 814 A.2d at 83. The court further noted a "child of a multi-millionaire generally expects a lifestyle of unusual privi-

lege and advantage" and that "children of wealth 'are entitled to every expense reasonable for a child of affluence.'" *Id.* at 32–33, 814 A.2d at 83. The court rejected Freeman's suggestion that the child did not deserve increased support because the child was not accustomed to her father's "wealthy economic status." *Id.* at 33, 814 A.2d at 84. Rather, the court stated, "every child is entitled to a level of support commensurate with the parents' economic position." *Id.*

In the instant case, like in *Smith,* the non-custodial parent argues that the child's "needs" should determine the appropriate amount of child support. A child's "needs," however, depend on the parents' economic position. The advantages of Mr. Gladis's economic strength, accordingly, should flow to his child living in a nation of less wealth, just like the advantages of Freeman's extreme wealth should pass to his child. The Guidelines apply in this case regardless of whether Ivana lives in Maryland or the Slovak Republic.

## C.

■ Mr. Gladis raises a number of miscellaneous arguments for why the trial judge should have deviated from the Guidelines. First, he claims that his right to "reasonable and liberal visitation" under the Judgment of Absolute Divorce justifies a reduction in his child support obligation. Although the matter of the visitation schedule has not been established, Mr. Gladis argues that the trial court should have abrogated his child support obligation for the summer months, "the only reasonable time visitation could occur under the circumstances." This argument fails. As Mr. Gladis admits, he has not seen Ivana for ten years. In addition, because no order has established a visitation schedule, this Court cannot possibly determine how or whether Mr. Gladis's visitation will affect the parties' economic situations or the child's needs. The record in this case simply does not support Mr. Gladis's claim on this matter.

■ Mr. Gladis further asserts that the trial court should have deviated from the Guidelines because, at the time the

Amended Order was entered, there had been a substantial increase in the cost of caring for the child of his current marriage. This argument also fails. Mr. Gladis did not present evidence before the Master of any expenses associated with his second child, nor did he request a new factual hearing to present such evidence while Ms. Gladisova's Motion to Alter or Amend the Circuit Court's Order was pending. Even if Mr. Gladis had presented evidence of increased child care expenses related to his second child, that evidence alone cannot justify a deviation from the Guidelines. *See* Code, § 12–202(a)(2)(iv). Although, according to Section 12–202(a)(2)(iii)(2) of the Family Law Article, the expense of other children in the non-custodial parent's household is relevant to whether an award is "unjust" or "inappropriate," Section 12–202(a)(2)(iv) expressly states that evidence of this support obligation, by itself, cannot rebut the presumption that the award under the Guidelines is correct. The trial court's judgment to not deviate from the Guidelines on this ground was not a clear abuse of discretion.

■ Finally, Mr. Gladis complains that he cannot claim Ivana as a dependent on his tax return and that, *if* the Slovak Republic has a tax structure similar to the United States, Ms. Gladisova would have an additional tax benefit associated with claiming Ivana as a dependent. This contention is founded entirely on speculation. The record, which contains no evidence of the Slovak Republic's tax structure, also provides no indication that Ms. Gladisova would receive a tax benefit as the custodial parent of Ivana. Given the complete absence of any evidence of the Slovak Republic's tax system, Mr. Gladis's argument on this point cannot form the basis for overturning the trial court's discretionary judgment not to depart from the Guidelines.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.*

RAKER and HARRELL, JJ., dissent.

RAKER, J., dissenting, in which HARRELL, J., joins:

I respectfully dissent from the Court's holding that the Maryland Child Support Guidelines are applicable in determining the appropriate child support obligation of the non-custodial parent when the custodial parent and the child live outside the United States. In my view, the guidelines are irrelevant under these circumstances; therefore, the court should determine the appropriate child support without reference to the guidelines.

The Circuit Court for Baltimore City applied the guidelines to determine Mr. Gladis's child support obligation to Ms. Gladisova, who lives in the Slovak Republic with the parties' daughter, Ivana. Upon examining the underlying principles and the purpose of the guidelines, I conclude that the Legislature did not intend for the guidelines to be applied when the custodial parent resides outside of the United States. I agree with the arguments of Mr. Gladis that the guidelines do not apply outside of the United States, and that even if they *do* apply, it is unjust and inappropriate to apply them in the instant case because of the great disparity in the cost of living between the United States and the Slovak Republic.

## I.

The Child Support Guidelines were enacted in 1989 to comply with federal law and regulations. *See Voishan v. Palma*, 327 Md. 318, 322, 609 A.2d 319, 321 (1992). The federal law required that the guidelines be enacted and that they be based on specific descriptive and numeric criteria and result in a computation of the support obligation. *Id.* at 322, 609 A.2d at 321. When originally enacted, the guidelines were advisory, *see* 1989 Maryland Laws ch. 2 § 12–202(c), at 12, but became mandatory in 1990. 1990 Maryland Laws ch. 58 § 12–202(a)(1), at 400 (codified as amended at Maryland Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.) §§ 12–201–12–204 of the Family Law Article). A court is required to utilize the child support guidelines in setting child support obligations; there is a rebuttable presumption that the support award based

upon the application of the guidelines is correct. FL § 12–202. *Drummond v. State*, 350 Md. 502, 511–12, 714 A.2d 163, 168 (1998). This presumption can be rebutted by evidence that applying the guidelines would be unjust or inappropriate in a particular case.

The guidelines are based on the principle that "a child should receive the same proportion of parental income, and thereby enjoy the standard of living, he or she would have experienced had the child's parents remained together." *Voishan*, 327 Md. at 322, 609 A.2d at 321. In developing the guidelines, the Maryland Senate Judicial Proceedings Committee used the "Development of Guidelines For Child Support Orders: Advisory Panel Recommendations and Final Report" promulgated by the United States Department of Health and Human Services' Office of Child Support Enforcement. *Id.* According to this report, the purpose and need for the guidelines was "(1) to 'remedy a shortfall in the level of awards' that do not reflect the actual cost of raising children, (2) to 'improve the consistency, and therefore the equity, of child support awards,' and (3) to 'improve the efficiency of court processes for adjudicating child support.' " *Id.* at 322, 609 A.2d at 321. Additionally, the Legislature intended to "limit the necessity of the court to make those findings of fact required in existing case law . . . except to the extent they may be applicable under subsections (a)(2)(ii), (iii) and (iv) of § 12–202." *Gates v. Gates*, 83 Md.App. 661, 666, 577 A.2d 382, 385 (1990).

The General Assembly developed a schedule of basic child support obligations which is included in the guidelines. *See* § 12–204(e) of the Family Law Article. The basic child support obligation is determined in accordance with the schedule of basic child support obligations set forth in § 12–204. The schedule establishes child support obligations only for those parents having a combined monthly adjusted actual income of $10,000 or less. If the parents combined adjusted actual income exceeds that level, the court may use discretion in setting the amount of child support.

The General Assembly developed the schedule based on the Income Shares Model. *Voishan,* 327 Md. at 322, 609 A.2d at 321. The Income Shares Model "establishes child support obligations based on estimates of the percentage of income that parents in an intact household typically spend on their children." *Id.* at 322–323, 609 A.2d at 321. "The economic assumptions underlying this model are based on recent studies estimating expenditures on children as a proportion of household consumption." *Id.* at 334, 609 A.2d at 327 (McAuliffe, J., concurring).

The General Assembly contemplated that in certain situations use of the guidelines would be inappropriate. Section 12–202(a)(2)(i) establishes a rebuttable presumption that the amount of child support which would result from the application of the guidelines is the correct amount. Section 12–202(a)(2)(ii) provides that the presumption may be rebutted by evidence showing that the application of the guidelines would be unjust or inappropriate in a particular case. The guidelines set out a non-exhaustive list of factors that the court can consider in determining whether the use of the guidelines is unjust or inappropriate. *See* § 12–202(a)(2)(iii)(1)(2).

If the court finds that it is unjust or inappropriate to apply the guidelines in a particular case, the court must state on the record its reasons for departing from the guidelines. § 12–202(a)(2)(iv). In this situation, the court must formally state:

A. the amount of child support that would have been required under the guidelines;

B. how the order varies from the guidelines;

C. how the finding serves the best interests of the child; and

D. in cases in which items of value are conveyed instead of a portion of the support presumed under the guidelines, the estimated value of the items conveyed.

§§ 12–202(a)(2)(iv)(2).

## II.

A review of the underlying purpose of the guidelines indicates to me that the General Assembly did not intend them to

be applicable when the custodial parent and child are living outside of the United States. The General Assembly enacted the guidelines because it wanted, *inter alia,* to remedy situations in which the court was awarding the custodial parent far less in child support than the parent's actual costs of raising the child. *Voishan,* 327 Md. at 322, 609 A.2d at 321. The guidelines were enacted to ensure that the custodial parent receive an amount of child support consistent with the *actual monthly costs* of raising the child. I believe the Legislature intended the guidelines to address only those child support awards made for children who reside within the United States.

The underlying principles of the Income Shares Model which the schedule is based upon reveal that the General Assembly did not intend for the court to apply the guidelines in cases where the custodial parent lives abroad. The Income Shares Model "establishes child support obligations based on estimates of the percentage of income that parents in an intact household typically spend on their children." *Voishan,* 327 Md. at 322–323, 609 A.2d at 321. The estimates "are based on recent studies estimating expenditures on children as a proportion of household consumption." *Voishan,* 327 Md. at 334, 609 A.2d at 327 (McAuliffe, J., concurring).

It is not plausible that the General Assembly, in developing the schedule, researched or took into account the percentage of income that parents living in different countries spend on their children. It is more reasonable to assume that the statistics the General Assembly examined contained information about how much parents in the United States spend on their children as a proportion of their household consumption. It is hard to believe that the assumptions underlying the "Income Shares Model" establishing child support obligations on the percentage of income that parents in an intact household typically spend on their children and the studies estimating expenditures on children as a proportion of household consumption considered data outside the United States. Even though there is disparity in the cost of living within jurisdictions in the United States, and the guidelines do apply where the non-custodial parent resides outside Maryland but within

the United States, it is unrealistic to attempt to equalize standards of living throughout the entire world and, in my view, the Legislature did not attempt to do so.

Applying the guidelines to the instant case results in Ms. Gladisova receiving significantly more in child support payments than Ivana's actual monthly costs. Ivana lives with her mother in the Slovak Republic,[1] where the average cost of living is much lower than in Maryland or in the United States. The Master found that the cost of raising children in the Slovak Republic is very disparate from the cost of raising children in the United States. Although Ivana's monthly expenses are disputed, there is no disagreement that they are below $280.[2] According to the schedule in the guidelines, Mr. Gladis is required to pay Ms. Gladisova $497 per month in child support.

## III.

Mr. Gladis contends that, even if the guidelines do apply when the child resides outside the United States, the Circuit Court abused its discretion in not deviating from them based on the extreme economic disparity between the United States and the Slovak Republic. Child support awards made pursuant to the guidelines will be disturbed only if there is clear abuse of discretion. *Voishan*, 327 Md. at 331, 609 A.2d at 326. Mr. Gladis contends that his $497 monthly obligation, as derived from the guidelines, is "unjust and inappropriate" because the monthly cost of raising Ivana in the Slovak Republic is the equivalent of only $233.

---

1. The Master found that according to a Slovak Republic government resource, the Slovak Republic the average gross expenses *per household* in 2001 were the equivalent of $168.80 per year. The definition of household was not provided.

2. Throughout the proceedings below, there have been several different estimates of Ivana's monthly costs. The Master found her monthly costs to equal $275.88, Judge Hargadon found it to be $251.75, the State believes that it is $243.45 and Mr. Gladis believes that it is $233.00.

Ms. Gladisova maintains that the guidelines do not allow for deviation merely because the custodial parent lives in a country with a different standard of living. Moreover, Ms. Gladisova maintains that the Circuit Court's application of the guidelines does not create an unjust or inappropriate child support obligation because the amount neither excessively burdens Mr. Gladis, nor inappropriately enriches the child. Ms. Gladisova maintains that the guidelines do not permit deviation because the guidelines are based on the principle that a child is entitled to a standard of living that corresponds to the economic position of the parents. She argues that based on this principle, Mr. Gladis should pay the amount stipulated by the guidelines—even though it is greater than Ivana's actual costs—because he has a higher standard of living in the United States than Ivana has in the Slovak Republic.

Section 12–202(a)(2)(ii) permits the court to deviate from the guidelines if it finds that they would dictate an unjust or inappropriate award. Although § 12–202(a)(2)(iii) sets forth some factors which the court "may consider" in "determining whether the application of the guidelines would be unjust or inappropriate in a particular case," the use of "may" indicates that the Legislature did not intend this list to be exhaustive. There is nothing in the statutory language itself that supports Ms. Gladisova's contention that the court is forbidden from considering an international disparity in child-rearing costs as a factor in determining the appropriateness of a Guideline award.

Ms. Gladisova argues that this case is analogous to the circumstances in *Smith v. Freeman,* 149 Md.App. 1, 814 A.2d 65 (2002). In *Smith,* the custodial mother sought an increase in the father's child support obligation not because the child's needs had increased, but because the father's salary as a professional football player had increased by two million dollars. *Id.* at 21, 814 A.2d at 77. The court granted the mother's modification request on the principle that the child is entitled to a standard of living that corresponds to the parents' economic position, and that had the parents remained

together, the child would have enjoyed a better lifestyle. *Id.* at 23, 814 A.2d at 78.

The instant case is distinguishable from *Smith.* In *Smith,* had the parents remained together, the child would have enjoyed a much higher standard of living because of her father's high salary increase. *Id.* at 32–33, 814 A.2d at 83. In the case *sub judice,* had Mr. Gladis and Ms. Gladisova remained together, Ivana would not have had a higher standard of living than she does currently. Mr. Gladis earns $42,000 per year and lives a modest and comfortable life with his new wife and seven-month old daughter. Had Mr. Gladis and Ms. Gladisova remained together, in either the United States or the Slovak Republic, they would have lived a lifestyle commensurate with the standards of the country in which they resided and not one considered luxurious by the local standard. Ivana currently lives a life that is more comfortable than that of most people in the Slovak Republic.[3] If Mr. Gladis is required to pay the amount stipulated by the guidelines, Ivana will have the financial ability to live a life of luxury in the Slovak Republic as compared to the ordinary standard of living in that country. Therefore, following the guidelines and giving Ms. Gladisova significantly more than her actual costs of raising Ivana is contrary to the principle that the child is entitled to the standard of living that she would have enjoyed had the parents remained together.

Even if we ignore the difference between the material expectations held by residents of Maryland and the Slovak Republic, the Circuit Court appears to have ignored the effect of purchasing power differentials. In doing so, it conflated *cost* of living with *standard* of living. The same bundle of goods and services which would constitute a middle class

---

3. The Master's findings in the proceedings below showed that Ivana has health insurance through her mother's employer, whereas most people in the Slovak Republic pay for medical services as they are rendered. Ms. Gladisova also has a vehicle, whereas the majority of the population in the Slovak Republic travels by public transportation. Furthermore, Ivana regularly attends dance and music lessons and has skis, a bicycle and an organ.

standard of living in Maryland could be purchased at significantly lower cost in the Slovak Republic. Exporting Mr. Gladis's U.S. dollars to the Slovak Republic and exchanging them for crowns greatly increases their purchasing power. Because she happens to be shopping in the Slovak Republic, Ivana can purchase more skis, bicycles, lessons, and insurance policies with her father's dollars than she could at Maryland prices. It is unjust to provide her (and her mother) this windfall at her father's expense, merely because Mr. Gladis happens to live in a country with a higher cost of living.

The application of the guidelines is unjust and unfair. In *People ex rel. A.K.*, 72 P.3d 402, 404 (Colo.App.2003), the noncustodial parent argued that the court should deviate from the Colorado child support guidelines because the children lived in Russia, where their economic circumstances were "very different from those on which the guidelines are based." *People ex rel. A.K.*, 72 P.3d at 404. The court found that the trial court erred in not considering whether the differing living expenses in Colorado and Russia would render applying the guidelines "inequitable, unjust, or inappropriate" and remanded the case to the trial court for this consideration. *Id.* at 405. In *Booth v. Booth*, 44 Ohio St.3d 142, 541 N.E.2d 1028 (1989), the court reviewed an award of child support and addressed whether the trial court could deviate from applying the child support guidelines based on the parents' widely differing costs of living in New York and Ohio. The court found that the trial court did not abuse its discretion in deviating from the guidelines. *See Booth*, 541 N.E.2d at 1030. The court further stated:

> If we were to assume, *arguendo*, that the trial court had failed to consider the respective costs of living of the parties, it *may* have indeed been "unreasonable" for the court to ignore such economic realities and, thus, the child support order might have amounted to an abuse of discretion.

*Id.* at 1030 (emphasis in original).

The instant case is similar to the situation in *A.K.* and *Booth* because of the disparity in the cost of living between the

United States and the Slovak Republic. Based on this disparity, it is unjust and inappropriate for the court to apply the guidelines strictly.

## IV.

The court should determine the appropriate amount of child support in this case without reference to the guidelines. In determining the appropriate amount of child support, the court should consider the needs of the particular child, the child's station in life, and the financial circumstances of the non-custodial parent. *See Wagshal v. Wagshal,* 249 Md. 143, 147–48, 238 A.2d 903, 906 (1968). The court should determine Mr. Gladis's child support obligation by balancing the best interests and the needs of Ivana with Mr. Gladis's financial ability to meet them. *See Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849, 854 (1986); *Rothschild v. Strauss,* 257 Md. 396, 398, 263 A.2d 511, 512 (1970); *Wagshal v. Wagshal,* 249 Md. 143, 147–48, 238 A.2d 903, 906 (1968). In applying the balancing test, the court should consider the needs of the child along with factors such as "the financial circumstances of the parties, their station in life, their age and physical condition, and expenses in educating the children." *Unkle,* 305 Md. at 597, 505 A.2d at 854; *see also Kramer v. Kramer,* 26 Md.App. 620, 636, 339 A.2d 328, 339 (1975); *Bowis v. Bowis,* 259 Md. 41, 43, 267 A.2d 84, 85 (1970); *Chalkley v. Chalkley,* 240 Md. 743, 744, 215 A.2d 807, 808 (1966).

I emphasize that while the discussion, *supra,* makes reference to the inequity of requiring Mr. Gladis to fund his daughter's comparatively privileged lifestyle in the Slovak Republic, I do not dissent because of the particular consequences in this case. Rather, my opinion is founded squarely on my belief that the Legislature could not have acted with the purpose of equalizing living standards when it adopted the guidelines. If Ivana lived in Monaco or Switzerland, I would find it equally appropriate for the Circuit Court to order a support award greater than that reflected under the guidelines to accommodate the higher actual costs of child-rearing in those countries relative to Maryland.

The court should not apply the guidelines in a situation where the custodial parent lives outside of the United States. Perhaps the Legislature will revisit the guidelines and make clear that they are inapplicable when the non-custodial parent lives outside of the United States.

Judge HARRELL has authorized me to state that he joins in this dissenting opinion.